No. 44,920

ROBERT C. LONDERHOLM, Attorney General of the State of Kansas, *Appellant* and *Cross-Appellee*, and KANSAS CITY, KANSAS, BRANCH NAACP, *Intervener-Appellant* and *Cross-Appellee*, v. UNIFIED SCHOOL DISTRICT No. 500 and RALPH E. EVANS, JOE H. VAUGHN, ROBERT A. FOTHERGILL, RALPH A. FULTON, JOHN O. YULICH and MRS. R. W. SCOVILLE, As Members of Said Board, *Appellees* and *Cross-Appellants*, and JOHN E. HIRSCH, RANDALL R. DUNN, MARY WOLFE, PHOEBE MAY and GERALD W. HALL, Individually and on Behalf of the Kansas City, Kansas, Teachers Association, *Inter-veners-Appellees* and *Cross-Appellants*.

(430 P. 2d 188)

Opinion filed July 6, 1967.

*Park McGee,* Assistant Attorney General, argued the cause, and *Robert C. Londerholm,* Attorney General, and *Richard 'H. Seaton,* Assistant Attorney General, were with him on the brief for the appellant and cross-appellee.

*Hartzell J. Whyte,* of Kansas City, argued the cause, and *Robert H. Waters,* also of Kansas City, was with him on the brief for the intervener-appellant and cross-appellee.

*Willard L. Phillips,* of Kansas City, argued the cause, and *P. B. McAnany* and *Thomas M. Van Cleave, Jr.,* both of Kansas City, were with him on the brief for the appellees and cross-appellants.

*Roger D. Stanton,* of Kansas City, argued the cause, and *Lee E. Weeks* and *Leonard O. Thomas,* both of Kansas City, were with him on the brief for the interveners-appellees and cross-appellants.

The opinion of the court was delivered by

SCHROEDER, J.: This is a statutory action under the Kansas act against discrimination (K. S. A. 44-1001, *et seq.*) brought by the Attorney General of Kansas charging that the Board of Education of the city of Kansas City, Kansas, discriminated against negroes in several respects.

The basic question of law presented involves a construction of the Kansas act against discrimination—whether the act requires public school authorities to integrate their teaching staff at the various schools under their jurisdiction.

This action was instituted by the Attorney General (plaintiff-appellant and cross-appellee) by filing a complaint, authorized by K. S. A. 44-1005, against Unified School District No. 500 and individual members of the school board (defendants-appellees and cross-appellants), charging that the Board of Education of the city of Kansas City, Kansas, has continually and within six months immediately prior to the filing of the complaint on August 26, 1963, engaged in unlawful employment practices in violation of G. S. 1961 Supp. (now K. S. A.) 44-1009($a$). The unlawful practices were alleged to consist of:

"(A) Refusing to hire or consider for employment qualified negro applicants as teachers in schools attended predominantly by white children.

"(B) Segregating its negro elementary school supervisor from its white elementary school supervisors in furnishing office accommodations to such supervisors, and by limiting its negro supervisor to work in schools attended predominantly by negro children while its white supervisors are assigned to both white and negro schools.

"(C) By giving official sanction to separate city-wide teachers' associations for negro and white elementary teachers and making membership in such segregated associations compulsory for its elementary school teacher employees."

The answer of the school board specifically denied each of the charges alleged to be unlawful employment practices.

The act created a state commission having power to eliminate discrimination in employment to be known as the antidiscrimination commission, and provided that after the effective date of the act such commission was to be known as the commission on civil rights. At the hearing before this commission the NAACP was permitted to intervene in the action as a complainant (intervener-appellant and cross-appellee).

Before the matter was heard by the commission a fourth issue was injected into the case. At the pretrial conference, counsel for the Attorney General stated, although not in the pleadings, that the most important issue in the controversy was the refusal of the school board to transfer a teacher, over his objection, from one school to another solely for the purpose of integrating or mixing the faculties.

Before the commission heard the case the school board by motion attempted to learn which individuals had been discriminated against by the refusal of the board to hire them or consider them for employment in predominantly white schools; but the commission denied the motion.

The case was heard by the commission on the three issues enumerated in the complaint and the fourth issue injected at the pretrial conference, despite the recommendation of its own investigating officer that there was no probable cause upon the third issue in the complaint.

After hearing the matter the commission found against the school board on all four issues, and concluded that the school board "has engaged and at the time of the hearing was engaged in unlawful, discriminatory practices in violation of the Kansas Act Against Discrimination." It thereupon issued a sweeping order as follows:

"THE COMMISSION THEREFORE ORDERS RESPONDENT:

"1. To forthwith cease and desist from such unlawful and discriminatory practices.

"2. To employ and consider for employment as teachers in its schools Negro applicants on the basis of training, qualification and school need and not on the basis of the racial makeup of the pupils of such school.

"3. To assign its Negro elementary school supervisors for duty as it does its white supervisors and not on a basis of a Negro supervisor to a predominantly Negro school.

"4. To furnish its supervisors, Negro and white alike, office and school accommodations on the basis of position and not on the basis of color.

"5. To cease and desist from recognizing and encouraging separate and segregated teachers' associations.

"IT IS FURTHER ORDERED, that respondent take the following affirmative actions:

"1. To reassign its teachers and to establish procedures so as to eliminate the condition whereby Negro teachers are being assigned to predominantly Negro schools and white teachers to predominantly white schools.

"2. To employ and consider for employment qualified Negro applicants as teachers in schools attended predominantly by white children.

"3. To issue a public statement on its policy of no discrimination in employment and assignment of teachers and to use the same in the recruitment, selection and hiring of its teachers.

"4. To make known to the various teachers' associations its disapproval of separate teachers' associations for Negro and white elementary school teachers.

"5. To provide the Kansas Commission on Civil Rights, within ninety days hereafter, with a written report of the manner of compliance with the above orders."

Thereupon the school board appealed to the Wyandotte County district court.

After the commission announced its decision that teachers should be transferred from one school to another to effect integration, the teachers became alarmed and intervened by a class action so that their rights might be fully protected.

The motion by the teachers to intervene recites: .

"Come now John E. Hirsch, Randall R. Dunn, Mary Wolfe, Phoebe May and Gerald W. Hall, acting for themselves individually and as officers of and as designated agents for Kansas City, Kansas Teachers Association and move for leave to intervene as respondents. . . ."

The teachers' motion to intervene is intermingled with the third issue in the complaint, which charged that the school board discriminated by supporting separate teachers' associations—some only for negro teachers, and some only for white teachers. There was absolutely no testimony at the hearing before the civil rights commission to support this charge. The superintendent of schools testified positively that such separate associations did not exist, and the investigating commissioner found there was no probable cause to submit this issue to the commission for decision. In fact, counsel arguing the teachers' cause before this court on appeal stated that the teachers' association which intervened represented all tenure teachers, both colored and white, in the Kansas City, Kansas, school system. Furthermore, the individuals named as interveners and officers of the Kansas City, Kansas, Teachers' Association constitute a biracial group.

The trial court heard the appeal in accordance with the authority conferred by statute (K. S. A. 44-1011), and determined the matter on motion for summary judgment filed by the respective parties after discovery proceedings had been completed. The trial court had before it the pleadings, the record on appeal, additional evidence in the form of admissions and answers to interrogatories produced in the district court, together with the briefs of the respective parties.

Findings of fact and conclusions of law incorporated by the trial court in its journal entry of judgment filed on the 17th day of October, 1966, are as follows:

"FINDINGS OF FACT:

"1) Respondents-Appellants filed an appeal from orders made by the Kansas Commission on Civil Rights as of April, 1965, the appeal having been taken on April 28, 1965.

"2) That by its findings and conclusions Kansas Commission on Civil Rights directed Respondent-Appellant to 'reassign its teachers and to establish procedures so as to eliminate the condition whereby Negro teachers are being assigned to predominantly Negro schools, and white teachers to predominantly white schools.'

"3) That the evidence presented against Respondents-Appellants was based

mainly on charts prepared by Respondent-Appellant Board of Education and conversations and letters; no teacher employed by Respondent-Appellant and no applicant for a teacher's position with Respondent-Appellant testified for Complainant-Appellee; that therefore complainant did not sustain the burden of proof put upon him.

"4) That in September of 1960, Respondent-Appellant was defendant in a case known as the 'Downs Case', filed in the United States District Court; that the decision in that case was handed down on July 19, 1963; and that during this period of time no change was made by Respondent-Appellant in its operation in the City of Kansas City, Kansas.

"5) That since July 19, 1963, some teachers have voluntarily accepted assignments to schools in which the predominance of pupils was not of the same race and color as that of the transferring teacher; and this is the situation that has existed to February, the date of the hearing.

"6) That teachers working for Respondent-Appellant are divided into two categories: (a) Tenure teachers, those who have worked three years and more, and (b) probationary teachers, who must teach for three years before being admitted as tenure teachers.

"7) That there is now and has been for many years an association known as the Kansas City, Kansas, Teachers' Association, comprising all tenure teachers, this being the only association recognized by Respondent-Appellant.

"CONCLUSIONS OF LAW:

"1) Chapter 44, Article 10, K. S. A., is the 'Kansas Act Against Discrimination.' Chapter 72, Article 54, K. S. A., is 'Tenure of Instructors, cities over 120,000.'

"2) That the Attorney General is authorized by Chapter 44, Article 10, K. S. A., to make, sign and file a complaint under the Kansas Act Against Discrimination; that Respondent-Appellant is an 'employer' under that act.

"3) That before 1961 school districts were not included within the term 'employer'. But in the 1961 Supplement to the General Statutes of Kansas, 1949, the legislature, by legislative enactment, deleted the words 'school districts', so that in 1961 Respondent-Appellant did come within Chapter 44, Article 10, K. S. A.

"4) That by virtue of legislative enactment, Respondent-Appellant District was thus subject to Chapter 44, Article 10, K. S. A., in 1961, but that there was pending in the United States District Court an action designated *Downs et al. v. The Board of Education of Kansas City, Kansas, et al.*, which case was not decided until July of 1963 [affirmed in *Downs v. Board of Education of Kansas City*, 336 F. 2d 988 (10th Cir. 1964)]; that Respondent-Appellant was not in position to comply with the Kansas law until the judgment in the Downs case.

"5) That beginning in 1963 voluntary acts of teachers resulted in some changes, as suggested by the Kansas Commission on Civil Rights.

"6) That in addition to the laws relating to school districts and educational associations, and with particular reference to teachers, Chapter 72, Articles 5401 to 12, inclusive, are in full force and effect, these articles being the 'tenure' section of Kansas laws, and by this teachers attain tenure.

"7) That tenure teachers by contract with Respondent-Appellant District have a contractual right, which in turn becomes a property right so far as said teachers are concerned; that in fulfilling their duties, they are subject to the Respondents-Appellants and to require the Respondents-Appellants to transfer tenure teachers only because of race or color, over his or her objection, is a violation of the contractual and property right of the teacher; that teachers serving their probationary period are not included within the term 'tenure teacher' and are subject to K. S. A. Chapter 44, Article 10.

"8) The Court finds that the evidence presented as to the Kansas City, Kansas, Teachers' Association and as to discriminatory practice against Supervisor Lewis does not warrant the Court sustaining the action of the Kansas Commission on Civil Rights on these points.

"9) The motions for summary judgment by the Respondents-Appellants and by the Intervener Kansas City, Kansas, Teachers' Association are sustained insofar as they concern teachers with tenure; the balances are overruled. The motion for summary judgment by Complainant-Appellee is overruled except insofar as it concerns probationary teachers, who are subject to Chapter 44, Article 10; with regard to these teachers, it is sustained.

"10) The costs are to be equally divided between Complainant-Appellee and Respondents-Appellants."

The Attorney General and the NAACP have appealed only from a part of the trial court's decision: (1) That part of the decision finding against them on the first charge of discrimination stated in the complaint; and (2) that part of the decision which held that teachers with tenure cannot be transferred from one school to another to effect integration, over their objection (the issue injected at the pretrial conference before the commission on civil rights).

The first portion of the appeal is from the findings of fact made by the trial court, and the second raises a question of law.

The school board and the intervening teachers have cross-appealed from that portion of the order of the trial court holding that teachers without tenure can be transferred, over their objection or protest, from one school to another to effect integration.

While the Attorney General and the NAACP did not appeal from the decision of the trial court on the second and third charges of discrimination set up in the complaint, some mention should be made of these issues in view of the findings made by the commission on civil rights.

The second charge of discrimination concerned the negro supervisor of elementary schools. His testimony was not for the Attorney General and the NAACP but for the school board. Briefly, his testimony was that he despised discrimination but that he was not discriminated against. He felt he was a trusted supervisory member

of the staff of the school board; that his opinions were sought and valued, not only by the superintendent of schools but by other members of the staff as well. He was consulted whether the problems involved negro students or not.

Notwithstanding this uncontroverted testimony, the civil rights commission found the school board guilty of this charge of discrimination without any evidence whatever, and the trial court properly reversed the commission.

The third charge of discrimination in the complaint has already been discussed in connection with the intervention by the teachers. In the face of no evidence whatever to support this charge in the complaint, the commission nevertheless found the school board guilty on this point, which the trial court also properly reversed.

The first issue on appeal is whether the trial court erred in finding that the Attorney General and the NAACP did not sustain the burden of proof on the first charge in the complaint.

The record discloses the school board operates the public school system in Kansas City, Kansas. These schools consist of elementary schools (kindergarten through sixth grade); junior high schools (seventh through ninth grade); senior high schools (tenth through twelfth grade); and a junior college (thirteenth and fourteenth grades). There are thirty elementary schools in the system, four junior high schools, four senior high schools and one junior college. On the date the complaint was filed the system employed more than 840 teachers, all or many of whom could be vitally affected by the decision in this case.

Prior to 1950 the school system was completely segregated. In that year the white and negro junior colleges were combined. In 1954 after the Supreme Court of the United States held that segregated schools were unlawful (*Brown v. Board of Education*, 347 U. S. 483, 98 L. Ed. 873, 74 S. Ct. 686 [1954]), a program to eliminate segregation was launched by the school board to take effect by a series of steps.

In October, 1960, the NAACP, one of the appellants in this case, filed an action in the United States District Court for the District of Kansas (*Downs v. Board of Education of Kansas City*, 336 F. 2d 988 [10th Cir. 1964]) charging the school board of the city of Kansas City with practicing segregation in its school system.

While that action was pending in the federal district court, the school board refrained from taking any action tending to integrate

the staff members of its schools. The school board believed that with the pendency of litigation it should not change existing procedure until after a decision was rendered by the court. The *Downs* case was decided by the United States District Court in July, 1963, and from that time on the Board of Education has taken positive and active steps toward integration of staff members of all schools.

A history of the Kansas City, Kansas, school system concerning its problems with respect to the white and colored population in the city may be found in the *Downs* case. The memorandum decision of Judge Stanley in the Federal District Court of Kansas in the *Downs* case was introduced in evidence before the commission on civil rights, and was made a part of the record on appeal to this court.

When the *Downs* decision was announced in July, 1963, teaching assignments in the Kansas City, Kansas, school system for the year 1963 had already been made. Nevertheless, a number of negro teachers were interviewed in an attempt to obtain teachers who would voluntarily transfer to the Quindaro school, which was then staffed by white teachers. Three were obtained. During that year a vacancy occurred on the staff of the junior college, and it was filled with a negro teacher. A few other changes were also made. The following year, many negro teachers were employed in predominantly white schools, and many white teachers were employed in predominantly negro schools. The board not only hired for any vacancy in the system without regard to race, but it actually tried to employ negro teachers for white schools and vice versa. The big stumbling block was in finding qualified negro teachers.

It was not until July, 1961, that the Kansas act against discrimination became effective as to public school systems. (See, K. S. A. 44-1002, and L. 1961, ch. 248, § 2.)

The instant action was not filed until the 26th day of August, 1963, and *it was not filed by or at the instigation of any teacher or teachers.*

The appellants rely upon complainant's exhibit No. 11, which is a chart showing a breakdown of the teachers of the school system within Kansas City, Kansas. It shows the total number of teachers in each school, and it also shows how many of the teachers in each school were negro and how many were white. The chart also shows the percentage of negro students in each of those schools. While the exhibit does not disclose the date it purports to represent, the

chart does disclose that the teaching staff in the thirty-five different schools listed was either all negro or all white. Dr. Orvin L. Plucker became the superintendent of schools in Kansas City, Kansas, in September, 1962. He testified that the faculties were segregated at that time, and this appeared to him to be the result of an old policy. The record discloses the testimony of two witnesses concerning a conversation with Dr. Plucker July 19, 1963, in which he was asked as superintendent whether negro applicants were considered for jobs only in negro schools, to which the superintendent answered, "I am afraid that's true."

A witness by the name of Mrs. Porteous related that on December 11, 1963, Mr. Fothergill, a member of the school board, stated that if she wished to have a negro teacher for her child, she should move into a negro community. On cross examination as to this point Mrs. Porteous testified:

"Q. Now, don't you recall at that meeting that they told you they were planning some integration steps?

"A. It was explained that they had already hired a teacher in one incident. This was explained by the Superintendent. The Board did not explain that they had any definite plans at that time.

"Q. No, but you knew that Dr. Plucker was speaking, and the Board members were sitting there, and they didn't contradict him, did they, when he said they were making some plans for integration?

"A. They indicated that there were plans for hiring without discrimination. There was no indication that there was anything definite. Insofar as that would bring integration, yes, but there was no overall plan for reassignment.

"Q. I see. So they did tell you that 'When we hire teachers from now on, we will hire them without regard and assign them without regard to race or color,' didn't they?

"A. Yes, and I knew that before that.

"Q. You knew that that was their policy before that?

"A. Yes, sir.

"Mr. Edwards told the witness that the primary purpose of the Board of Education was education not integration. The Board indicated that there were plans for hiring without discrimination."

The foregoing evidence must be analyzed in view of the claimed charge of discrimination on point one in the complaint, and the anti-discrimination statute. The complaint charged that the school board *discriminated against negroes* in "Refusing to hire or consider for employment qualified negro applicants as teachers in schools attended predominantly by white children." In other words, if a qualified negro teacher made an application to the school board to

teach in the system, or made an application to be assigned to a predominantly white school and the school board refused to hire or assign him, then a claim for relief might exist. The record presented on appeal in this case discloses there was no such application involved in any of these proceedings. The word "refuse" has a well-defined meaning which is frequently used and not difficult to understand.

When the record is examined there is no evidence that the school board refused either to hire or assign a negro applicant in a predominantly white school. In fact, there is no evidence that any qualified negro applicant requested the school board to employ him, or that any qualified negro applicant or teacher requested the school board to assign him to a predominantly white school. The school board cannot be convicted of refusing an offer unless some showing is made that an offer had been proposed. The trouble in this case is that, although the charge is clear and positive, there is not one scintilla of evidence to support it.

The Attorney General and the NAACP argue that the trial court found a violation of the act on the first ground of the complaint because it granted summary judgment for the Attorney General and the NAACP with regard to all teachers who have probationary status within the school system. It is argued this conclusion is inconsistent with its finding that there was no evidence to support the charge on count one.

The position was taken by the trial court that immediately upon the rendering of the decision in the *Downs* case, it became necessary for the school board to do something to start integrating the faculties in the public school system of Kansas City, Kansas; that while the *Downs* case was pending, the Board of Education was under no obligation to comply with the Kansas act against discrimination by reason of the pending litigation against it.

Be that as it may, we regard the conclusion of the trial court to which reference has just been made as raising a question of law which is to be determined by a construction of the act, and not as an inferential finding of fact adverse to its specific finding on the first charge in the complaint.

The Attorney General and the NAACP argue where the complainant makes a showing that virtually all of the employer's negro employees are assigned to one group of schools, and virtually all of its white employees are assigned to a different school, a presumption

arises that these employees have been segregated on the basis of race. It is contended the duty of rebutting this presumption should fall upon the respondent, and if he does not do so a violation of the act should be held to have been established. (Citing, *Gainer v. School Board of Jefferson County, Ala.*, 135 F. Supp. 559 [N. D. Ala. 1955], where there was actual discrimination against negro teachers in the payment of salaries.)

The Attorney General and the NAACP also cite *Hernandez v. Texas*, 347 U. S. 475, 98 L. Ed. 866, 74 S. Ct. 667 (1954); and *Norris v. Alabama*, 294 U. S. 587, 79 L. Ed. 1074, 55 S. Ct. 579 (1935), where the systematic and arbitrary exclusion of members of the defendant's race from the jury lists solely because of their race or color denied the criminal defendant the equal protection of the laws guaranteed to him by the Fourteenth Amendment. It is argued the same reasoning should be applied where neither the complainant nor any teacher in the Kansas City, Kansas, school system has direct access to the process by which teachers are assigned; that it would be virtually impossible for them to establish by direct evidence any instance in which a teacher was assigned to any particular school on the grounds of race; that they must rely on a pattern giving rise to a presumption of segregation.

Presumptions are discussed under the code of evidence in K. S. A. 60-413 through 60-416. The presumption to which the Attorney General and the NAACP allude is not a conclusive or irrebuttable presumption.

K. S. A. 60-414 in pertinent part provides:

". . . (*b*) if the facts from which the presumption arises have no probative value as evidence of the presumed fact, the presumption does not exist when evidence is introduced which would support a finding of the non-existence of the presumed fact, and the fact which would otherwise be presumed shall be determined from the evidence exactly as if no presumption was or had ever been involved."

Another section of interest is K. S. A. 60-415, which reads:

"If two presumptions arise which are conflicting with each other the judge shall apply the presumption which is founded on the weightier consideration of policy and logic. If there is no such preponderance both presumptions shall be disregarded."

Attention is called to the fact that in the instant case not one single teacher was called to testify that the school board discriminated against him or her in any way. Under the law of Kansas as found in numerous cases (including *Donley v. Amerada Petro-*

*leum Corp.,* 152 Kan. 518, 106 P. 2d 652; and *Blackburn v. Colvin,* 191 Kan. 239, 380 P. 2d 432) when a party to a case has failed to offer evidence or produce witnesses within his power to produce, an inference arises that the evidence or testimony which would have been produced would have been adverse to that party. This inference in and of itself gives rise to a presumption which conflicts with the presumption asserted by the Attorney General and the NAACP. It cannot reasonably be said which of these presumptions is founded on the weightier consideration of policy and logic. The result is both presumptions must be disregarded. This leaves the complainant without any evidence whatever to support the charge of discrimination on the first point in the complaint.

In fact, there is evidence in the record of a specific nature reflecting that discrimination did not exist. There is evidence in the record that the school board was actively seeking to employ negro teachers. One of the Attorney General's witnesses was Roland Swain, director of placement at Kansas State University. He testified the school board was actually advertising for negro teachers. While this may have been a technical violation of the civil rights act to refer to any person by race, evidence that the school board was advertising for negro teachers can hardly support the charge that it refused to hire them. Dr. Plucker positively testified he never at any time refused to hire a teacher because of race, and that he never refused to assign a teacher to a school of predominantly another race because of race. He also testified that at no time did he ever refuse to employ a qualified negro teacher; that he was on directive to employ negro teachers, and was making an effort to do so—the directive being by the Board of Education.

The Attorney General and the NAACP suggest in their brief the reason teachers did not testify that they sought reassignment and were refused was because of the fear that if they did, their positions would be in jeopardy. This can hardly be advanced as a valid reason in view of the Kansas act against discrimination establishing the civil rights commission. If a teacher was discharged because he testified to the truth in a trial, the school board would be squarely within the grips of the commission. This argument is fortified by the fact that when the civil rights commission decided that some teachers would have to be transferred from one school to another, *over their objection, in order to effect integration,* the

teachers, both white and negro, immediately became alarmed and employed counsel of their own and entered the case as interveners, opposing the decision of the commission.

There is federal authority which supports the proposition that while litigation was pending against the school board concerning discrimination, it was under no obligation to change its position. Under this theory the charts and exhibits introduced by the Attorney General disclosed the situation existing only during the pendency of the *Downs* case in the federal courts. While the *Downs* case was pending, the antidiscrimination statute became effective. (July 1, 1961.) The authority justifying such inaction on the part of the school board pending litigation is *Springfield School Committee v. Barksdale*, 348 F. 2d 261 (1st Cir. 1965), a civil rights case. In the opinion the court said:

". . . Plaintiffs have pointed to the fact that defendants ceased, or virtually ceased, assertedly on advice of counsel, their voluntary activities upon the institution of suit. We attach no great significance to this. The application of a stick is hardly an encouragement to egg-laying proclivities, golden or otherwise. We forbear wondering whether plaintiffs could not have expected this, and were more interested in a court order itself than in actual performance. We similarly forbear wondering whether defendants' cessation was entirely motivated by concern that their work to find an educationally feasible way to reduce imbalance would be wasted if the court ordered another route to be taken, or was due in part, at least, to pique. Rather, we recognize, as was said in Taylor v. Board of Education, D. C. S. D. N. Y. 1961, 191 F. Supp. 181, at 197, aff'd 2 Cir., 1961, 294 F. 2d 36, cert. den. 368 U. S. 940, 82 S. Ct. 382, 7 L. Ed. 2d 339.

" 'Litigation is an unsatisfactory way to resolve issues such as have been presented here. It is costly, time consuming—causing further delays in the implementation of constitutional rights—and further inflames the emotions of the partisans.' Where no order is called for, we are unprepared to use defendants' inactivity following suit as an excuse for retaining dormant, or anticipatory, jurisdiction. . . ." (pp. 265, 266.)

In *Downs* a class action was brought by a group of negro children through their parents as next of friends to enjoin the Board of Education of the city of Kansas City, Kansas, from continuing allegedly discriminatory practices. The United States District Court for the District of Kansas, Arthur J. Stanley, Jr., J., rendered a judgment from which the plaintiffs appealed. In the Tenth Circuit Court of Appeals the decision of Judge Stanley, finding that the Board of Education's overall policy met constitutional requirements, with the exception of its policy permitting transfers of students from schools in which they were in racial minority, was upheld on September

25, 1964. It was held the policy of the school board had served to effect a racially nondiscriminatory school system even though certain elementary schools were still composed of predominantly negro students, and certain of white students, a junior high school and a senior high school were still virtually entirely negro, boundary lines for junior high schools were changed and assertedly negro schools were staffed by negro personnel, and white schools by only white personnel. (*Downs v. Board of Education of Kansas City*, supra.)

The Attorney General and the NAACP in their brief say:

". . . The equal protection clause of the Fourteenth Amendment, which has similar purposes with regard to public education, has been held to have been violated on precisely the kind of pattern evidence produced here. In *Dowell v. School Board of Oklahoma City Public Schools*, 219 F. Supp. 427, 442-443 (W. D. Okla. 1963), the court found just such a pattern of faculty segregation to be a violation of the equal protection of the laws as guaranteed to Negro school childen. A similar result was reached in *Christmas v. Board of Education of Hartford County, Md.*, 231 F. Supp. 331, 336-337 (D. Md. 1964). *Board of Public Instruction of Duval County, Fla. v. Braxton*, 326 F. 2d 616, 620-621 (5th Cir. 1964), *cert. den.* 377 U. S. 924, 12 L. Ed. 2d 216, 84 S. Ct. 1223."

The above decisions cited are a counterpart to *Downs* in the rash of federal litigation that followed *Brown v. Board of Education*, 347 U. S. 483, 98 L. Ed. 873, 74 S. Ct. 686 (1954), which held it unlawful to maintain segregated schools in the public school system. While it is true charts were introduced in the *Dowell* case to disclose the number of white and negro students in the various schools in the Oklahoma City public school system, there was specific evidence in the record that of the integrated schools the school board had employed no negro principals or negro teachers since the *Brown* decision, except in schools where the school attendance was overwhelmingly negro students. The federal court concluded from all the evidence the time had come for the Oklahoma City school board to begin the integration of its teaching staff.

In the other two cases there was specific evidence of discrimination on the basis of race in hiring new teachers for desegregated schools.

As to the first charge of discrimination stated in the complaint, we hold the record presented on appeal supports the trial court's finding that the complainant did not sustain the burden of proof put upon him.

The Attorney General and the NAACP contend the trial court erred in holding that teachers with tenure cannot be transferred

from one school to another in order to break down an existing pattern of racial segregation in school faculties. Conversely, the school board and the teachers contend the trial court erred in holding that teachers who have not acquired tenure under K. S. A. 72-5401 to 72-5412 can be transferred from the school to which they have been regularly assigned to another school, *over their objection, solely for the purpose of making a more complete integration of faculties.*

This is the real nub of this lawsuit. The school board has refused to transfer teachers legally employed by it, from one school to another, *over their objection, to effect integration.* The civil rights commission ruled that the school board must do so. On appeal the trial court held the school board was not required to do so as far as teachers with tenure are concerned; but that it was required to transfer teachers who had not yet attained tenure. The reasons advanced by the school board for its refusal to make such transfers are as follows:

(1) To do so would be a violation of the civil rights act because to require a teacher to transfer from one school to another on the basis of race is the rankest kind of discrimination.

(2) A more practical reason is because if the school board should attempt to do so, it would lose from forty to fifty teachers. Teachers are not so easily come by that the school board can afford to take any step which would alienate such a large number of its professional staff.

(3) Even teachers who felt they could not afford to leave the school system would be dissatisfied and troubled; and it is well recognized in educational circles that teachers who are dissatisfied and troubled do not function well, and do not achieve the best results with the education of children. It is the primary function of teachers to educate children.

It should be emphasized the controversy is over teachers who are satisfied with their current assignments and do not want to teach elsewhere, particularly under circumstances which are different. It does not concern teachers who are willing to take part in the integration of the school system because as to those teachers, when the matter was heard in the district court, they were already teaching in integrated positions. The school board is not willing to transfer teachers from one school to another over their objection, and the Attorney General and the NAACP will accept nothing less.

The federal courts have held that the Fourteenth Amendment to the United States Constitution does not command integration of races in public schools.

After the original opinion in *Brown v. Board of Education,* supra, the court set the case for further argument on the question of how its decision should be implemented. Thereafter, a three-judge district court was designated in Kansas to consider the Kansas aspects of the instructions in the *Brown* case. The district court in *Brown v. Board of Education of Topeka,* 139 F. Supp. 468 (D. Kans. 1965), stated:

". . . Desegregation does not mean that there must be intermingling of the races in all school districts. It means only that they may not be prevented from intermingling or going to school together because of race or color." (p. 470.)

The foregoing language was approved in *Bell v. School City of Gary, Indiana,* 324 F. 2d 209 (7th Cir. 1963). The court there also said:

"We approve also of the statement in the District Court's opinion, 'Nevertheless, I have seen nothing in the many cases dealing with the segregation problem which leads me to believe that the law requires that a school system developed on the neighborhood school plan, honestly and conscientiously constructed with no intention or purpose to segregate the races, must be destroyed or abandoned because the resulting effect is to have a racial imbalance in certain schools where the district is populated almost entirely by Negroes or whites. . . .'" (p. 213.)

A recent case in the United States Court of Appeals for the Sixth Circuit is *Deal v. Cincinnati Board of Education,* 369 F. 2d 55 (1966). The court there said:

"Although boards of education have no constitutional obligation to relieve against racial imbalance which they did not cause or create, it has been held that it is not unconstitutional for them to consider racial factors and take steps to relieve racial imbalance if in their sound judgment such action is the best method of avoiding educational harm. Balaban v. Rubin, 14 N. Y. 2d 193, 250 N. Y. S. 2d 281, 199 N. E. 2d 375 (1964), cert. denied 379 U. S. 881, 85 S. Ct. 148, 13 L. Ed. 2d 87 (1964); Morean v. Board of Education of Montclair, 42 N. J. 237, 200 A. 2d 97 (1964)." (p. 61.)

The federal district judge for the Eastern District of Tennessee was concerned with a revised plan for the complete desegregation of the city schools in Knoxville, Tennessee, in *Goss v. Bd. of Ed., City of Knoxville, Tenn.,* (1965) 10 Race Rel. L. Rep. 1642 [Vander-

bilt University School of Law]. The trial court after the pretrial conference ordered, among other things:

". . . Without limiting the generality and effectiveness of the foregoing, all teachers, principals and other school personnel shall be employed by defendants and assigned or re-assigned to schools on the basis of educational need and other academic considerations, and without regard to race or color or the persons to be assigned, and without regard to the race or color of the children attending the particular school or class within a school to which the person is to be assigned. No transfer or re-transfer of a teacher, principal or other school personnel may be granted or required for considerations based upon race and color and no assignment or re-assignment of such teacher, principal or other school personnel may be made for considerations based upon race or color.

"All tenure and seniority rights are to be observed and the defendants will not utilize or attempt to utilize the provisions of the State Teacher Tenure Law or any other law, custom or regulation conferring discretion upon them in the employment and discharge of teachers or the abolition of teaching positions in such manner as to discriminate either directly or indirectly on account of race or color in the employment, discharge, re-employment, assignment, or re-assignment of teachers, principals or other school personnel in the Knoxville City School System." (p. 1643.)

Another case holding that a person may not be compelled to transfer from one school to another because of his race or color is *Brown v. County School Board of Frederick County, Va.*, 245 F. Supp. 549 (W. D. Va. 1965). While that case involves students in the public school system, the issue is the same as the one presently before the court. There the court said:

"It is well established in this Circuit and elsewhere that a freedom of choice plan, in which the school authorities allow the student, or his parents, to freely choose the school which he is to attend, is 'an acceptable device for achieving a legal desegregation of schools.' Bradley v. School Board, 345 F. 2d 310, 318-319 (4th Cir. 1965), and cases cited therein, n. 17. *Such a view is the logical result of the accepted principle that the Fourteenth Amendment does not outlaw voluntary separation of the races, but only discrimination which forces separation.* Bradley v. School Board, 317 F. 2d 429, 438 (4th Cir. 1963); Jeffers v. Whitley, 309 F. 2d 621, 629 (4th Cir. 1963); Briggs v. Elliott, 132 F. Supp. 776, 777 (E. D. S. C. 1955) (three-judge court on remand). . . ." (p. 555.) (Emphasis added.)

While the Attorney General and the NAACP throughout their brief speak of the teachers in the Kansas City, Kansas, school system as being segregated on the basis of race, it appears from the issue injected at the pretrial conference that what they are actually concerned with is the compulsory integration of teaching staff in the

various schools. They argue the present practices of the school board are inconsistent with the Kansas act against discrimination.

The Attorney General and the NAACP refer to the purposes of the antidiscrimination statute set forth in the first section of the act, and emphasize that the opportunity to secure and to hold employment is a civil right of every citizen; and that it is to protect these rights that the act was passed and the commission established. They argue K. S. A. 44-1006 enjoins the court to give the act a liberal construction for the accomplishment of these purposes. Certainly, they argue, these purposes will be furthered by a construction of the act which prohibits discrimination against an entire class as well as against individual members of a class. From this point they conclude the act requires integration of the teaching staff of the various schools in the public school system. They then jump to their ultimate conclusion that a teacher can be transferred from the school to which he has been regularly assigned to another school, over his objection, solely for the purpose of making a more complete integration of the teaching staff.

The declaration of the state policy and purpose of the Kansas act against discrimination is set out in the first section. (K. S. A. 44-1001.) It states, among other things:

". . . The practice or policy of discrimination against individuals in relation to employment or in relation to full and equal accommodatons in hotels, motels, cabin camps and restaurants by reason of their race, relations, color, national origin or ancestry is a matter of concern to the state, that such discrimination threatens not only the rights and privileges of the inhabitants of the state of Kansas but menaces the institutions and foundations of a free democratic state. It is hereby declared to be the policy of the state of Kansas to eliminate discrimination in all employment relations and to eliminate and prevent discrimination, segregation, or separation in hotels, motels, cabin camps and restaurants." (Emphasis added.)

The complaint in the instant case charged the school board with unlawful employment practices. The second section of the act (K. S. A. 44-1002) defines unlawful employment practices as:

"(g) The term 'unlawful employment practices' includes only those unlawful practices and acts specified in section 44-1009 of the General Statutes Supplement of 1961, and includes segregate or separate."

K. S. A. 44-1009 in pertinent part provides:

"It shall be an unlawful employment practice:

"(a) For an employer, because of the race, religion, color, national origin or ancestry of any individual to refuse to hire or employ, or to bar or to dis-

charge from employment *such individual* or to otherwise discriminate against *such individual* in compensation or in terms, conditions, or privileges of employment." (Emphasis added.)

The construction of the language in the Kansas act against discrimination, as is true with the construction of the language of any statute, is a matter of law and not a matter of fact. (*State, ex rel., v. Mills*, 171 Kan. 397, 233 P. 2d 720.)

It should be emphasized that the ·foregoing act prohibits discrimination against *any individual,* and it is not confined to members of any minority group. Thus, discrimination can be against white individuals, as well as against negro individuals, or others.

Would it be proper for the school board under the foregoing act to say to a teacher because you are white you must be transferred to a school other than the one where you are now teaching in order that the faculty may be better integrated?

It is obvious this would be just as much a violation of the anti-discrimination act as for the school board to say to a negro teacher because you are a negro you cannot teach in a certain school.

It is abundantly clear the Kansas act against discrimination bars discrimination only, and is not concerned with the integration of the races.

The word "discriminate" is defined in Webster's Third New International Dictionary as:

"to . . . distinguish between . . . to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit."

The word has been judicially defined in *Wimberly v. Ga. So. & Fla. Ry. Co.,* 5 Ga. App. 263, 63 S. E. 29 (1908), as "treating one differently from another." (p. 266.)

The foregoing definitions do not indicate that the word "discriminate" can be used synonymously with the word "integrate," which has an entirely different meaning. "Integrate" has been defined as "to unite with something else." (Webster's Third New International Dictionary.)

It can therefore be said if the school board does not discriminate against any individual in refusing to hire, in refusing to employ, in compensation, or in terms, conditions or privileges of employment, it has satisfied the admonition of the Kansas act against discrimination. In other words, it has no duty or obligation under this act to take any affirmative step to effect integration.

The foregoing is based upon the complaint filed herein and the assertion of the Attorney General and the NAACP that the present employment practices of the school board are inconsistent with the Kansas act against discrimination. (But see, *United States v. Jefferson County Board of Education,* 372 F. 2d 836 [5th Cir. Dec. 29, 1966], construing the two *Brown* decisions [*Brown v. Board of Education,* 347 U. S. 483, 98 L. Ed. 873, 74 S. Ct. 686 (1954); and *Brown v. Board of Education,* 349 U. S. 294, 99 L. Ed. 1083, 75 S. Ct. 753 (1955)], and re-examining school desegregation standards in the light of the Civil Rights Act of 1964 and the Guidelines of the United States Office of Education, Department of Health, Education, and Welfare.)

The Attorney General and the NAACP argue in their brief as follows:

"The provisions of Sec. 44-1002($g$) and Sec. 44-1009($a$) (1), being parts of the same act, should be read together. *Harris v. Shanahan,* 192 Kan. 629, 635, 390 P. 2d 772 (1964). When this is done, it becomes clear that segregation or separation of employees on racial grounds constitutes an unlawful employment practice. Racial segregation or separation of employees is the simplest and most fundamental kind of discrimination against individual employees in the terms, conditions and privileges of their employment. It is for this reason that the legislature, while aiming the provisions of K. S. A. 44-1009($a$) (1) at the discrimination against any individual, went on to state in K. S. A. 44-1002($g$) that segregation and separation are included within the practices outlawed by K. S. A. 44-1009."

Aside from the ambiguity of the expression "and includes segregate or separate" added at the end of subparagraph ($g$) in 44-1002, *supra,* when the statute is analyzed in the face of the declared state policy and purpose of the act as expressed in 44-1001, *supra,* in view of the issue here to be determined, we cannot say the act compels the school board to transfer a teacher in the public school system, over his objection, because of his race, to a school other than the one to which he has been regularly assigned in order that the faculty may be better integrated.

Under the Kansas act against discrimination the school board has no right to compel such transfer, and the civil rights commission has no authority to attempt to compel such transfer.

When the teachers intervened and the district court accepted the case for determination, the process of integrating the teaching staff of the various schools in Kansas City, Kansas, was voluntarily under way.

While the school board may have no trouble assigning new teachers to the various schools in a voluntary plan aimed to encourage integration, the problem, as indicated by the intervening teachers, is whether or not teachers who are presently teaching in the system and have obtained tenure can be involuntarily removed from their present teaching position and transferred to another school where the faculty makeup is predominantly of a race other than their own. Both colored and white teachers would be affected.

The trial court seized upon the distinction between probationary teachers (K. S. A. 72-5403) and teachers who have obtained tenure (K. S. A. 72-5404) in construing the Kansas act against discrimination. We fail to see how the construction of the antidiscrimination act can be affected by the tenure status of a teacher under the act providing for the tenure of instructors in cities having a population of more than 120,000 inhabitants. (K. S. A. 72-5401 to 72-5409, inclusive.)

Furthermore, under the state of the record we fail to see a need to consider the property rights of teachers, if any, under their teaching contract with the school board. On the facts in this case, as indicated by the record, the contract which the various teachers have with the school board specifies only that they teach in the Kansas City, Kansas, school system. The teachers' contract does not specify a particular school. Thus, insofar as the teachers' contracts are concerned, the school board could assign a teacher to teach anywhere within its school system. But it may not be wise administration or professionally efficient to transfer a teacher to another school against that teacher's wishes. Dr. Plucker testified concerning the transfer of teachers that he confers at length with teachers and gives weight to their thoughts and opinions in regard to a transfer.

When the Attorney General filed the complaint in the instant case, he set forth three specific unlawful employment practices in which the school board was alleged to have discriminated against persons of the negro race in violation of the Kansas act against discrimination. On each of these charges he failed to sustain the burden of proof cast upon him to show a violation of the act. The issue injected at the pretrial conference presented a question of law to the trial court on the construction of the act, which it erroneously determined.

We hold the Kansas act against discrimination bars discrimination only. It does not purport to be concerned with the integration of

the races as such on the teaching staff of a public school system or anywhere else. Therefore, the school board cannot be compelled under the Kansas act against discrimination to transfer a teacher in the public school system, over his objection, because of his race, to a school other than the one to which he has been regularly assigned in order that the faculty may be better integrated.

For the reasons heretofore assigned, the order of the lower court is affirmed in all respects, except that portion thereof sustaining the complainant's motion for summary judgment as it concerns probationary teachers, which is reversed.