Michelle GRAHAM, an Infant Who Sues by Her Parents, Guardians and Next Friends, Charles GRAHAM and Tammy Graham, Plaintiff,

v.

WYETH LABORATORIES DIVISION OF AMERICAN HOME PRODUCTS CORPORATION, Defendant.

Aaron GEISLER, an Infant Under the Age of Eighteen, Who Sues by His Parents, Guardians and Next Friends, Herbert A. GEISLER and Cynthia A. Geisler; and Herbert A. Geisler and Cynthia A. Geisler, Individually, Plaintiffs,

v.

WYETH LABORATORIES, A DIVISION OF AMERICAN HOME PRODUCTS CORPORATION, a Foreign Corporation; and Wyeth Laboratories, Inc., a Foreign Corporation, Defendants.

Nos. 85–1481–K, 88–1094–K.

United States District Court, D. Kansas.

March 14, 1991.

**1452**

Andrew W. Hutton, Michaud, Hutton & Bradshaw, Wichita, Kan., Ted Warshafsky, Warshafsky, Rotter, Tarnoff, Gesler, Reinhardt & Bloch, Milwaukee, Wis., for plaintiffs.

Albert J. Knopp, Baker & Hostetler, Cleveland, Ohio, Albert Herrington and Debra Arnett, McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, Kan., Robert Martin, Martin, Pringle, Oliver, Wallace & Swartz, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This decision is in response to, and in compliance with, the Tenth Circuit Court of Appeals' remand for a full evidentiary hearing in connection with defendant Wyeth's motion to disqualify plaintiff counsel's law firm, Michaud & Hutton, now Michaud, Hutton & Bradshaw (hereinafter "Hutton"). *See Graham v. Wyeth Laboratories*, 906 F.2d 1419 (10th Cir.1990). The Tenth Circuit also remanded *Geisler v. Wyeth Laboratories*, Misc. No. 89–566 (10th Cir. Oct. 11, 1990).

Wyeth complains that attorney Randall Fisher, an associate member of the Hutton firm since February of 1989, was, from May, 1981 through September, 1987, a member of the local law firm representing Wyeth, McDonald, Tinker, Skaer, Quinn & Herrington (hereinafter McDonald, Tinker), and has served as Wyeth's attorney in substantially related matters.

This court first addressed Wyeth's complaint in *Geisler v. Wyeth Laboratories*, 716 F.Supp. 520 (D.Kan.1989). While the factual dispute remaining for decision is more fully described hereinafter, it is sufficient to say that Wyeth's complaint then was really no different than it is today.

It was then claimed that throughout Mr. Fisher's employment with McDonald, Tinker he was exposed to the firm's matters, including that of Wyeth, and once he became a director of the firm in 1985 it is claimed by Wyeth that Fisher was involved in and/or exposed to substantive discussions pertaining to trial and defense strategies, including the *Graham* case. In addition, Wyeth claims that Mr. Fisher was assigned to represent Wyeth in a case entitled *Taylor v. Wyeth, et al.*, 139 Mich.App. 389, 362 N.W.2d 293 (1984) which involved claims allegedly arising from the use of oral contraceptives. In October, 1984, Fisher and attorney Debra Arnett, of the same office, visited Wyeth's facility in Radnor, Pennsylvania, to meet with several representatives of Wyeth and its legal department and with its medical director, Mahlon Bierly, M.D.

For reasons noted in *Geisler*, notwithstanding Fisher's denials, this court involved itself no further than the Radnor visit. Following the mandate of *Smith v. Whatcott*, 757 F.2d 1098 (10th Cir.1985), the court held that under Model Rule of Professional Conduct 1.9, Fisher's former

representation of Wyeth in the oral contraceptive case was substantially related to the instant litigation, and therefore this court had no choice but to conclude that Fisher's meeting with Dr. Bierly in an attorney-client relationship put in place an irrebuttable presumption that the client, Wyeth, through Bierly, had revealed facts which required Fisher's disqualification.

On reaching the foregoing finding, the Hutton firm was also disqualified.

As this court's decision further notes, on making the foregoing findings and being impressed with an exception noted in *Smith*, this court innovated with the engagement of a "Chinese wall" or screening device which was intended to assure resolution of Wyeth's concerns and reconcile the needs of all parties. Given the novel nature of this procedure, the court also acquiesced in Wyeth's interlocutory appeal.

During the pendency of that appeal, the *Graham* appeal came on for hearing before the Tenth Circuit, at which time Wyeth directly moved the circuit for an order of disqualification. Ironically, during the pendency of the Wyeth appeal, the Kansas Supreme Court announced its decision in *Parker v. Volkswagenwerk Aktiengesellschaft*, 245 Kan. 580, 781 P.2d 1099 (1989), which changed the ground rules. For purposes here, *Parker* has changed everything!

Today, the circuit's mandate requires an inquiry as to whether Fisher acquired information protected by Rules 1.6 and 1.9(b) of the Model Rules of Professional Conduct which is material to the matter in his new law firm.

Consistent with the Tenth Circuit's decision, it is presupposed that the following findings are made: (a) that the moving party (Fisher) and his prior law firm (McDonald, Tinker) had represented the client (Wyeth), whose interest is materially adverse to the client (Graham) or his new law firm (Hutton); (b) that the matter in Fisher's new firm is the same or substantially related to the previous representations; (c) that the new firm knows of the controversy arising from the conflict.

Consistent with the circuit mandate, the quest here is with the presence or absence of *actual* knowledge of material fact which pertains to such protected information.

■ This court has to determine for the litigants the following issue necessary for decision here: has Fisher established with his evidence that at no time, while a former associate or director of McDonald, Tinker, which represented Wyeth in the DTP matters, including the time assigned by his firm to represent Wyeth's interests in an oral contraceptive case, did he ever acquire actual, material and confidential information from Wyeth's representatives or through his attorney colleagues in McDonald, Tinker?

Following a full evidentiary hearing on September 17, 1990 and a full review of the transcript, the court's trial notes, briefs and suggested findings of fact and conclusions of law, together with oral arguments taken on March 1, 1991, and consistent with some findings and comments extended by the court at that time which are incorporated herein, the answer is "yes". This court holds that at no time herein has Mr. Fisher been privy to, communicated, or been exposed directly or indirectly to any such information. In light of these findings and as a consequence thereof, attorney Randall Fisher and his new firm of Michaud, Hutton & Bradshaw are not to be disqualified, and the defendant's motions should be dismissed.

The factual dispute arises in two separate settings. First, the case addresses Fisher's professional activities within the McDonald, Tinker office, and his alleged exposure to Wyeth's DTP matters; secondly, the case addresses those events which allegedly occurred while Fisher visited the Radnor facility in October, 1984. The court will address the latter first.

*The Radnor Visit*

In the summer of 1984, Wyeth engaged McDonald, Tinker for the defense of *Taylor v. Wyeth*, an oral contraceptive matter. The case was assigned by attorney Herrington to Randall Fisher, then an associate attorney of the firm, principally because of his skills and some success in similar litigation. It was thought by Herrington that a visit to the Radnor facility

was advisable; in Fisher's view it was more of a public relations trip than a quest for information. Given the lapse in time, Fisher's memory is understandably sketchy insofar as precise details are concerned.

On October 3, 1984, Fisher and Debra Arnett met with Mr. Steve Johnson, an in-house attorney for Wyeth assigned to oral contraceptive cases. Fisher recalls this visit in part as follows:

He took us around, gave us a tour of the building, he told us that when the time came that he would start telling us what we were to do in the discovery of the case, when the time came what things we would do, or would not do in terms of defending. We met some people. He took us around, and, for example, he took us into a room that had a lot of file drawers in it, and he said, "This is where we keep the new drug applications and Reaction Reports that the FDA makes us keep". Did things like that.

Q. Did you review or examine any documents?

A. No, we never did. I think at one point in time, we went into a room where there were several large stacks of paper, and he said, "This is—I think he called it—our standard package. We will send it to you when we are ready for you to have it". But we didn't look at it.

Q. And what was the general theory of the *Taylor* case about.

A. Well, the *Taylor* case was an oral contraceptive case where the woman had a stroke, and there were a couple things involved, one of them was the issue of smoking.

Q. Did you bring back any Wyeth documents from your trip to Pennsylvania?

A. No. I remember asking him whether—"Aren't you going to give us anything to bring back to study and work on", and he said, "No, we will send it to you when I'm ready for you to have it".

Q. Do you recall meeting any individuals in particular, names, positions?

A. I remember that we met some people, and the way it came about, we were in Steve Johnson's office and he said, "I want to take you around and introduce you to some people that you're going to be working with later on". And I remember that we went out of his office, and if I recall correctly, his office was in the southeast corner of that particular area, and there were all kinds of partitions, offices around a big open area. We turned to the left, and went down a couple of doors, and we first stopped in, we met some guy that was roughly my age, and we chatted, he introduced himself but I can't remember his name, and he said something about: Well, I'm the guy who does this, and he just kind of generally talked about his basic assignment. Then we did that one or two more times, and then I remember we crossed a doorway that went to the south, and went into another group of offices, and we met a man that was a doctor, and, frankly, I don't remember his name. Everybody tells me it was Dr. Bierly, and I suppose it could have been. I don't know. Steve introduced us to this guy and said, "He's my assistant who helps me in oral contraceptive cases". I know that he was a doctor. I think—it sticks in my mind he was a pediatrician, but I don't know if that's correct, and it seems to me that he was retired from the navy, I think he told us that.

Steve said, "When this case gets going and things start happening, you will be working with him". Steve told me, as I understand it, that he would be our medical support or our medical assistant.

It was my understanding that this doctor, whoever he was, at that time worked on nothing but oral contraceptive litigation with Steve. So we talked. I remember he, Steve, told this doctor that I had represented Dr. Branson and this man said something about Kansas Courts had been—

(Transcript of Sept. 17, 1990 proceeding, pp. 48–51.)

Fisher has testified that DTP vaccine matters were never discussed, nor was anything recited to him remotely considered confidential. There was no reason for him to discuss DTP matters. (Transcript, p. 56.)

Attorney Arnett's version is different and quite precise. She recalls the conference with Johnson on October 3 and 4, which conference consumed approximately two and a half hours. Johnson took the two (Fisher and Arnett) to the offices of Drs. Bierly, Korba, and Laboudovich. The witness was also introduced to a man named Paul Uses, the custodian of records. She recalls that Dr. Bierly had responsibility for adverse reaction reports and other FDA matters, and that approximately an hour and a half was spent with this gentleman. This court recalls Dr. Bierly from his testimony in the *Graham* case.

Dr. Korba, in the course of an hour and a half, discussed the historical perspectives of oral contraceptives and his involvement in research and development of oral contraceptives.

Dr. Laboudovich—relatively new at Wyeth—was assisting Dr. Bierly in some of his responsibilities. The lawyers spent about 30 minutes with him.

Mr. Uses spent approximately 20 minutes with the lawyers. He then escorted them to a document vault to show them certain files. The attorneys spent 30 to 45 minutes looking at files and papers relating to the defense in *Taylor.*

In addition to the foregoing recitation of events, Wyeth's counsel, with counsel Arnett, proceeds to address the subject matter of the case, but in a rather innovative or creative way. In the course of Mr. Fisher's testimony, the court learned for the first time that none of the foregoing employers, particularly Bierly or Johnson, will appear (Transcript, p. 152), nor is their testimony offered by deposition. Rather, through Ms. Arnett, the conversations are expected to flow and substantive opinions drawn, yet because of Wyeth's claim of privileged communication between client and attorney, the actual subject matter is not to be revealed. (Transcript, p. 175–78.) In sum, the court is asked to decide, with-

out hearing the conversations, whether any of the discussion is protected. The court acquiesced in Hutton's objections and interjected its own concerns, but the questions and answers along these lines were permitted to be taken under advisement. (Transcript, pp. 184 at ln. 4, 196 at ln. 21). Arnett's answers were affirmative:

A. The general topics would relate to the defense of product liability cases. That's all I feel comfortable with saying as to that. I don't waive the privilege. It related to the defense of product liabilities in their drug cases.

Q. Well, did you understand that Wyeth had some special strategies and policies of its own which it was applying to the defense of these cases?

A. Yes, their own approaches; yes.

Q. And this is what you're saying is the area we're talking about?

A. Yes.

Q. All right. Now, if I were to ask you to relate the conversations or the disclosures of policy and strategy developed by Wyeth for the defense of its drug product cases, is your recollection of those discussions with the people you have named such that you could testify to those disclosures and describe them, relate the instances of this accurately and completely.

A. Yes.

Q. You have a clear recollection of what was told to you?

A. Yes.

(Transcript, p. 198.)

The record reflects this court's surprise, dismay, and indeed some irritation, with Wyeth counsel's plea of privilege between the conversations of Wyeth's key employers and the witnesses, i.e., Dr. Bierly and Johnson and attorney Fisher, and/or the subject matter of whatever documents Wyeth claims Fisher is supposed to have reviewed or discussed. The court has permitted this testimony with deep reservations with regard to an acceptance of the opinions of witness Arnett as to the material and confidential nature of same, while at the same time refusing to reveal whatever she is referring to. It is as if she is saying

here, "While I can't say what it is, believe me, judge, it is hot stuff! Believe me, because I say it is so!"

■ On reflection, the court's course is clear, but is actually no different than that suggested at the time of hearing. Wyeth's claim of privilege in this case is misplaced. Wyeth's very complaint, claiming revelations of material and confidential material between lawyer and client, puts in place a factual dispute between the client and a lawyer. The material and confidential information allegedly revealed in the course of those dealings is the very subject matter of this dispute. These are the issues that the Kansas Supreme Court contemplated a full hearing on; these are the issues that the circuit has remanded this matter for; of course, the claim is waived. A claim of privileged communication is not available here.

Next, as raised at the hearing, if the conversations are to be accepted by the court for the truth of the matter, and the testimony of Dr. Bierly and Johnson is paramount, any commentary as to what was said, or not said, by some third party, if offered for the truth, is hearsay.

■ There is more, the thrust of which was on the court's mind at the time of hearing, yet was not somehow resolved through the commentary with counsel. Simply said, where are witnesses Bierly and Johnson? No showing has been made as to their absence, nor has a request been made for their depositions. Witness Johnson communicated with Mr. Fisher in advance of this case. His whereabouts are known. There is no showing that he is not available to testify. Dr. Bierly was actually scheduled to testify in the retrial of *Graham*, which was set on November 27 but continued pending Wyeth's quest for a writ of certiorari. There is no question that this gentleman is available to testify in behalf of Wyeth. In the court's view, this case classically presents the situation where the court may presume that the reason neither witness is presented to support Wyeth is that neither can or will support Wyeth's position.

Kansas has long recognized the rule that "at least in civil cases, and applying alike to plaintiff and defendant, ... where a party has it within his power to produce witnesses, presumably favorably disposed toward him, to explain a transaction, or answer a controverted question, and fails so to do, it will be presumed that the testimony if produced would be unfavorable to his side of the controversy." *Trust Co. v. Allen*, 110 Kan. 484, 490, 204 P. 747 (1922).

This principle was restated in *Donley v. Amerada Petroleum Corp.*, 152 Kan. 518, 522, 106 P.2d 652 (1940), as follows: "Failure to throw any light upon an issue peculiarly within [one party's] own knowledge or reach, raised a presumption open to explanation, of course, that the concealed information was unfavorable to [such party]." *See also Armstrong v. City of Salina*, 211 Kan. 333, 339, 507 P.2d 323 (1973).

Finally, the court in *Cleveland v. Wong*, 237 Kan. 410, 701 P.2d 1301 (1985), noted that Kansas does recognize the general rule that " 'when a party to a case has failed to offer evidence or produce witnesses within his power to produce, an inference arises that the evidence or testimony which would have been produced would have been adverse to that party.' " (Quoting *Londerholm v. Unified School District*, 199 Kan. 312, 323–24, 430 P.2d 188 (1967)). The court said such rule "applies only to evidence or information peculiarly within the reach or control of the party failing to offer it." *Cleveland*, 237 Kan. at 421, 701 P.2d 1301.

The court finds that the reason witnesses Bierly and Johnson have not been called by Wyeth is because they cannot, or will not, support Wyeth's position that at any time material herein they imparted any confidential material to Fisher.

Additionally, and as with the documents, Ms. Arnett has identified certain adverse response documents. Here again, Arnett would not identify these documents, but would only have the court to understand that they are indeed material. As this court listened to the testimony, it recalled the mass of exhibits produced for Hutton in discovery, and which have been in Hutton's hands throughout the course of *Graham*. (Dkt. No. 20.) The court is certain

that if Ms. Arnett was reasonably candid with the court, or at least with Wyeth's counsel, and an identity of any of these documents was made, even *in camera*, once such identification was made, Hutton could readily retrieve them from its own massive files.

This court rejects the mode of practice put in place by Wyeth in the interest of supporting its defense. However creative and innovative this may appear, such a practice is patently unfounded and unfair. The court is unaware of any evidentiary fact finding process where such techniques can be tolerated.

Lastly, and of greater import, the court accepts the testimony of attorney Fisher. As in any case, the role of the trial judge is to make decisions of fact, and sometimes they are most difficult. In a situation such as this—one witness against another—neither to compromise—one says "yes" and the other says "no"—with little else it is most difficult. When in doubt, the person with the burden normally loses. In this case, this court has listened carefully to both witnesses. They are oceans apart. One of them is simply wrong. In the court's experience, there is something refreshing about the witness, however prejudicial his own recall or the absence of it may be, who honestly says, "I have no recall at this moment." Such a witness compares favorably with another, who, fully refreshed and perhaps rehearsed, is a little "too pat," reciting, book and page, minute by minute, witness by witness, events occurring five years ago.

This contrast is not intended to reflect on any actor here. Having listened to the witnesses and knowing Mr. Fisher, a person who needs no witness to vouch for his veracity, it strikes the court that if, at any time material here, Fisher was in any way exposed to confidential material pertaining to the DTP vaccine, he surely would have recalled it; more importantly, he would have admitted it. Fisher denies any exchange of information pertinent to this case, and he is believed by the court.

The court finds that witness Fisher was never exposed to any material or confidential information, directly or indirectly, however remote, which pertained to Wyeth's DTP process or defenses.

### The Involvement of McDonald, Tinker and Fisher

Moving to Fisher's activities within the McDonald, Tinker firm, it is best to start off where the Radnor visit leaves us. It appears little has transpired in the *Taylor* matter and Fisher was removed from it by February, 1985. At that time, he undertook involvement in another case which literally required his full attention. (Transcript, p. 65.)

*Graham v. Wyeth* was filed in April, 1985; yet Fisher was not privy to any discussions or files. In September, 1985, Fisher entered his appearance in *King v. Schraum & Lederle Lab*, a DTP case, defending Dr. Schraum. Fisher was assisted by attorney Pratt, a former associate of McDonald, Tinker, who testified as a corroborating witness for Fisher.

Some misgivings occurred within the McDonald, Tinker office for several reasons. First, there was a fear within the office that the plaintiff counsel in *King* would join Wyeth in the interest of confirming the identity of the product. The court surmises that if a doubt is raised here, even Dr. Schraum, through Fisher, may need to join Wyeth for this purpose. In either event, such an occurrence would be disastrous for McDonald, Tinker, as it cannot have it both ways.

About this time, another Wyeth case was under way in state court, and the discovery judge put the matter on stream in a consolidated manner. The situation was such that the McDonald, Tinker lawyers were literally serving their colleagues as adversary parties. (Transcript, p. 72.)

This situation also presented an occasion for ridicule from other attorneys, which, although not serious, was serious enough to be brought to attorney Herrington's attention. Herrington justifies either event because the clients are aware of the appearances of conflict and have approved the proceedings. Fisher further justified his representation of Dr. Schraum, to the exclusion of any dealing in a Wyeth case, because Herrington admonished him to

stay away from the Wyeth cases. His testimony in part was as follows:

And he [Herrington] said, "I have talked to her and here's what we are going to do". He said, "I don't want you to have anything to do with Wyeth, just stay away from the file, do your own medical research, and whatever, so whatever you get doesn't come from Wyeth". And I said, "Fine, Al, that's no problem". And we just walked off down the hall and that was it. It was just a casual conversation, it wasn't any big deal, it wasn't the kind of thing that required a board meeting or directors' meeting, it was just Al telling me that he had talked to his client, his client was a little apprehensive, and so the way to resolve it was just stay away from it. So that's the way it started out. And so, from there on out, I did my own research in terms of looking for what I wanted. I stayed away from the Wyeth material. Somebody had said that they shipped a bunch of stuff to the firm. I didn't know where it was, didn't care. It was important to me to keep Wyeth happy, too, because I was one of the directors, so my attitude was: okay, I'm not working on the case, it's no real change from the status quo except we have an understanding I won't touch it, so I didn't.

Q. (Mr. Hutton) Did you ever examine any Wyeth documents while you were at McDonald, Tinker?

A. No, never did, had no reason to.

(Transcript, pp. 70–71.)

Herrington denies this.

In April, 1986, Herrington, Fisher and Arnett journeyed to Washington, D.C. for attendance at a DIR Seminar. One segment of the program was on DTP vaccines and was available only to Wyeth counsel. According to Fisher, Herrington admonished Fisher "not to attend," and he did not. Herrington and Arnett did attend the session. It strikes the court that, given the pretense of "one big happy family" and a firm which maintains open files for any of its partners, Herrington's admonition to Fisher that he should refrain from attending this session is inconsistent and in the

court's view supportive of what Fisher has tried to say.

With regard to the foregoing, previous papers have been exchanged arguing the existence or nonexistence of some formal screening device. The court had hoped for some evidence—either way—on this score. There is none. However, there was in place an effective screening device running to Fisher, at Herrington's instance and admonitions, and Fisher faithfully complied therewith.

The court accepts Fisher's version of the events. In doing so, the court again finds that Fisher, while an associate or director of McDonald, Tinker, has never been exposed, directly or indirectly, to any conversations, information, or files which relate to any confidential matter of Wyeth or of interest to Hutton.

With these findings, there is a last event relied on by Wyeth which must be addressed. It appears that on September 20, 1987, 10 days before Fisher left the McDonald, Tinker firm to accept a judicial appointment, a directors' meeting took place. Fisher attended the meeting. *Graham* was under way and Herrington had raised some matters of trial strategy. Again, the court is expected to concur that whatever the event of interest may be, it will of course now benefit Hutton. In the same breath, the attorneys profess privileged communication. As a consequence of that, this court has no evidence as to the subject matter of this "trial strategy" meeting. In saying this, the court, during the course of arguments, surmised with Wyeth's counsel some possible subjects which gave rise to Mr. Herrington's concerns, if any. If the court is correct, such subject matters amount to nothing.

Again, for reasons cited with regard to the Radnor testimony, this court rejects out of hand any of the attorneys' testimony which pertains to a meeting that related to a form of trial strategy as being unfair and unfounded claims.

IT IS ACCORDINGLY ORDERED this 14th day of March, 1991, that the respective motions of defendant Wyeth to disqualify Michaud, Hutton & Bradshaw,

and/or Randall Fisher are denied. (Dkt. No. 53 in No. 88–1094.) Said law firm and attorney Fisher are at liberty to proceed now as attorneys of record in these actions.