IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,403

SAGE HILL,
*Appellant/Cross-appellee*,

v.

STATE OF KANSAS and ERNEST GARCIA,
*Appellees/Cross-appellants.*

SYLLABUS BY THE COURT

1.

The Kansas Judicial Review Act, K.S.A. 77-601 et seq., does not apply to the civil tort of retaliatory job action against an administrative agency.

2.

The Civil Service Board's jurisdiction under the Civil Service Act, K.S.A. 2018 Supp. 75-2929d(a), does not extend to retaliatory job actions in work assignments, relocations, or transfers.

3.

Under K.S.A. 2018 Supp. 75-2949(g) of the Civil Service Act, no civil service employee may be disciplined or discriminated against in any way because of the employee's proper use of the Act's appeal procedure.

4.

Kansas law recognizes the tort of retaliatory job action when a civil service employee is disciplined or discriminated against in any way because of the employee's proper use of the Civil Service Act's appeal procedure.

1

5.

An actionable retaliatory job action can include a civil service employer's act that is materially adverse to a reasonable civil service employee, i.e., harmful to the point it could dissuade a reasonable employee from exercising the employee's rights under the Civil Service Act.

6.

The Kansas Tort Claims Act, K.S.A. 75-6101 et seq., provides that a governmental entity can be found liable for the negligent or wrongful act or omission of any employee while acting within the scope of employment if (a) a private person could be liable under the same circumstances, and (b) no statutory exception to liability applies.

7.

When a litigant fails to adequately brief an issue, it is deemed abandoned.

8.

If a clearly defined mandatory duty or guideline exists, the discretionary function exception of the Kansas Tort Claims Act is inapplicable.

9.

The elements of a prima facie claim for retaliatory job action for using the Civil Service Act's appeal procedure are: (a) an employee filed a Civil Service Act appeal; (b) an employer knew the employee filed such an appeal; (c) the employer subjected the employee to a materially adverse job action; and (d) a causal connection existed between the filing of the appeal and the adverse job action.

10.

A court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue requires it to determine the state of mind of one or both of the parties.

Review of the judgment of the Court of Appeals in 53 Kan. App. 2d 155, 388 P.3d 122 (2016). Appeal from Shawnee District Court; REBECCA W. CROTTY, judge. Opinion filed September 6, 2019. Judgment of the Court of Appeals affirming in part and reversing in part the district court and dismissing the case is affirmed in part and reversed in part. Judgment of the district court is affirmed in part and reversed in part, and the case is remanded for further proceedings.

*Michael T. Miller*, of McCauley & Roach, LLC, of Kansas City, Missouri, argued the cause, and *Morgan L. Roach*, of the same firm, was with him on the briefs for appellant.

*M.J. Willoughby*, assistant attorney general, argued the cause, and *Derek Schmidt*, attorney general, was with her on the briefs for appellees.

The opinion of the court was delivered by

BILES, J.: Kansas Highway Patrol Trooper Sage Hill alleges the KHP retaliated by requiring him to move across the state to keep his job after the Kansas Civil Service Board ordered the agency to reinstate him to work. State law expressly provides no civil service employee—including a KHP trooper—may be disciplined or discriminated against "*in any way* because of the employee's proper use of the appeal procedure." (Emphasis added.) K.S.A. 2018 Supp. 75-2949(g). No one claims Hill improperly exercised his civil service right. This appeal presents three questions before this court: (1) whether a common-law cause of action for employer retaliation may be based on an adverse job action short of dismissal or demotion; (2) whether the State's sovereign immunity bars the claim regardless of its merits; and (3) whether the uncontroverted

3

material facts entitle defendants to summary judgment against Hill. The first two are matters of first impression.

The lower courts disagreed with each other in answering these inquiries although both ultimately held Hill's case could not go to a jury. *Hill v. State*, 53 Kan. App. 2d 155, 157, 388 P.3d 122 (2016). We granted review. A majority now affirms in part, reverses in part, and remands to the district court for further proceedings.

We hold the common-law tort of retaliation may be premised on an employer's action short of dismissal or demotion, such as the involuntary job relocation alleged in this case. To hold otherwise would undermine the purposes supporting common-law job retaliation claims and the important public policy expressed in the Kansas Civil Service Act, K.S.A. 75-2925 et seq. We further hold sovereign immunity does not bar Hill's claim. Finally, we conclude there are genuine issues of material facts precluding summary judgment. Remand is necessary for the district court to resolve these remaining controversies.

FACTUAL AND PROCEDURAL BACKGROUND

Given the procedural posture, all facts and inferences that may be reasonably drawn from the evidence are resolved in Hill's favor because the district court decided this case against him on summary judgment. *Lumry v. State*, 305 Kan. 545, 547, 385 P.3d 479 (2016); *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1204, 308 P.3d 1238 (2013); *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 330, 277 P.3d 1062 (2012). Our factual statement is prepared with that recognition.

In January 2008, the KHP hired Hill as a trooper and assigned him to Troop H in Cherokee County, which is in our state's southeastern corner. Hill worked there until

4

November 2011 when the KHP fired him over a dispute with a supervisor who was investigating a civilian complaint against him. Hill appealed to the Kansas Civil Service Board, which is statutorily created to provide civil service employees with an independent review for specific types of state agency employment actions. See K.S.A. 75-2929a (creation of board); K.S.A. 2018 Supp. 75-2929d(a) (board's authority to hear appeals concerning demotion, dismissal, or suspension of permanent employees in state classified service); K.S.A. 2018 Supp. 75-2935(1), (2) (including KHP troopers as classified state employees).

The board reversed the termination although it agreed Hill's misconduct warranted discipline. The board modified the sanction to a one-year suspension without pay and benefits. For the KHP, this was an unprecedented reversal of its command staff's decision to fire a trooper.

In reinstating Hill, the KHP decided to treat him as a new hire who could be "assigned" wherever needs were greatest. At that time, Finney County in southwestern Kansas had the greatest need. KHP Superintendent Ernest Garcia agreed and made the final decision. On December 13, 2012, Garcia sent Hill a letter, stating:

> "In accordance with the Final Order of the Civil Service Board, your dismissal as a Trooper is being modified to a suspension without pay and benefits for a period of one year from the date of your dismissal.
>
> "You are being returned to active duty effective November 6, 2012 and *transferred from Troop H to Troop E, Finney County*." (Emphasis added.)

KHP admits it is undesirable to involuntarily relocate a trooper previously assigned to another geographic area because it disrupts the trooper's personal life. Multiple command staff members testified they could not remember ever involuntarily

5

transferring a trooper after an initial area assignment as a new hire. Garcia also could not recall ever involuntarily changing a trooper's job placement. KHP further agrees no other trooper was involuntarily transferred to remedy the trooper shortage in southwestern Kansas, which was the ostensible reason for transferring Hill. The evidence before the district court showed no KHP trooper had been involuntarily transferred for at least the past four decades. KHP acknowledges it was more challenging to get troopers to serve in western Kansas.

Hill tried to administratively challenge his relocation. He asked the Civil Service Board to amend its reinstatement order to prevent it. The board denied the request by finding that it was untimely and that the KHP complied with its order by returning Hill to active duty. Hill then sought to appeal the transfer under the Civil Service Act, but the board determined it lacked jurisdiction because the Act limits its authority to agency initiated demotions, dismissals, or suspensions. See K.S.A. 2018 Supp. 75-2929d(a)(1).

Undeterred, Hill sought a hardship assignment from the KHP premised on caring for his mother, who suffered health problems including multiple sclerosis. Command staff recommended against this, believing the hardship was insufficiently documented and because troopers were needed in western Kansas. Garcia agreed and denied the request.

In February 2013, Hill reported for duty in Finney County. That same month, he requested relocation back to southeastern Kansas under the KHP's biannual voluntary transfer program called "make a wish." This gives troopers a chance to express a location preference and for the KHP to determine if that preference can be accommodated. The "make a wish" announcement included Cherokee County, Hill's prior assigned area, as needing manpower. Nevertheless, Hill's troop captain in southwestern Kansas and the command staff recommended against his request. Garcia agreed by letter, stating: "Sage,

6

a greater need exists for your services in your present duty assignment. It would not be practical or in the best interest of the agency to authorize a move."

In May 2013 Hill sued the KHP and Garcia in district court. He alleged his transfer was retaliatory and violated the public policy imbued in K.S.A. 2018 Supp. 75-2949(g) (prohibiting discipline or discrimination "in any way" against employees who properly pursue civil service appeals). He later amended the lawsuit to substitute the State of Kansas as a defendant for the KHP.

In October 2013 Hill made a second "make a wish" request to Cherokee County in response to another announcement listing that county as needing manpower. Again, his southwestern Kansas troop captain opposed transfer, citing the southwest region's continued staffing needs. Garcia denied Hill's request on the same rationale as before.

Also that October, Hill requested transfer to Troop G, which covers the Kansas Turnpike. He was the most senior trooper to bid for the position, and Garcia approved. Since December 2013 Hill has lived in Augusta, worked as a trooper along the turnpike, and received a promotion to a master trooper.

*The district court proceedings*

The defendants filed separate motions to dismiss. Relevant for this appeal, they claimed: (1) the district court lacked subject matter jurisdiction because Hill's exclusive remedy was under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq.; (2) the district court lacked subject matter jurisdiction because there is no private right of action under the Civil Service Act; (3) Hill failed to state a claim upon which relief could be granted; and (4) sovereign immunity shielded the defendants from liability under three provisions of the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 et seq.: K.S.A. 2018

7

Supp. 75-6103(a) (governmental entity liable for damages caused by the negligent or wrongful act or omission of its employees acting within scope of employment under circumstances in which the governmental entity, if a private person, would be liable), K.S.A. 2018 Supp. 75-6104(c) (no liability for enforcement or failure to enforce a law), and K.S.A. 2018 Supp. 75-6104(e) (no liability for discretionary function).

The district court denied the motions, concluding: it had subject matter jurisdiction; Hill stated a valid common-law retaliation claim based on the protection embedded within K.S.A. 2018 Supp. 75-2949(g) (prohibiting discipline or discrimination "in any way" against employees using the civil service appeal process); and the defendants had no sovereign immunity. In a follow-up order, the court clarified the decision to transfer Hill was an agency action under the KJRA but held that did not matter because Hill was seeking redress for the agency's tortious conduct—not for judicial review of the agency's administrative action.

Following discovery, the district court granted summary judgment in defendants' favor, noting Hill did not establish a prima facie retaliation case based on the uncontroverted record. It reached this conclusion by first acknowledging there could be a retaliatory "adverse employment action" claim for retaliation based on the Civil Service Act.

To establish a prima facie retaliation case, Hill had to prove: (1) he took a protected action; (2) the defendants knew about the protected action; (3) they took an adverse employment action; and (4) a causal connection linked the protected action to the adverse employment action. The district court found Hill satisfied the first two elements but failed to show the remaining two. The court stated Hill did not prove he suffered an adverse employment action because his transfer was not "the essential equivalent of a demotion." And it concluded Hill did not demonstrate the necessary causal link because

8

the only evidence to suggest the appeal caused the transfer, in the court's view, was that Garcia was "very angry." This, it concluded, was insufficient to demonstrate a causal connection even though the reinstatement order and transfer occurred close in time.

The court finally noted Hill failed to show the defendants' justification for the transfer was pretext. As to this, it reasoned,

"[T]he evidence consistently demonstrates that the [Command] Staff viewed the Plaintiff's placement as an assignment because they did not view him as an employee. No trooper can hold a position in another law enforcement agency while they are a trooper. Because the Plaintiff worked for the Cherokee County Sheriff's Department immediately prior to—and after—his reinstatement, the [Command] Staff viewed the Plaintiff not as an employee, but as a 'new body.' The [Command] Staff consistently testified that because of this unexpected addition, they wanted to place him where he was needed the most. The needs of KHP had changed from when the Plaintiff was terminated, and the strongest need was in Troop E. All five members of the [Command] Staff consistently testified to these views. This evidence demonstrates that a reasonable factfinder could only conclude that the [Command] Staff believe they legitimately placed the Plaintiff in Troop E to satisfy manpower needs, as opposed to transferring him involuntarily to retaliate against him."

Hill appealed. The defendants cross-appealed the earlier denial of their motions to dismiss.

*The Court of Appeals decision*

The Court of Appeals noted Hill presented, among his other arguments, two issues of first impression: (1) attempting to establish a public policy exception to the employment-at-will doctrine based on the anti-retaliation provisions in K.S.A. 2018 Supp. 75-2949(g); and (2) suing for what the panel characterized as a common-law tort of

9

"retaliatory job placement," as opposed to the more traditional retaliatory job actions recognized for firings and demotions. *Hill*, 53 Kan. App. 2d at 183. The panel ultimately held in the defendants' favor.

The panel agreed with the district court that the KJRA and the Civil Service Act were not exclusive means of recovery that barred Hill's lawsuit. It further held the Civil Service Act embodied a clear "public policy against employers retaliating against employees who appeal their dismissal, demotion, or suspension" and that a common-law tort action could be premised on an employer's retaliation for exercising Civil Service Act appeal rights. 53 Kan. App. 2d at 187. And it held there was no adequate alternative remedy for Hill's retaliatory job placement claim. 53 Kan. App. 2d at 189.

Although acknowledging this generally "would be enough to establish a public policy exception to at-will employment," the panel concluded retaliatory job transfers were insufficiently harmful to be a valid common-law tort—unlike a demotion or discharge. It reasoned Hill's job placement in southwest Kansas "resulted in no harm, that is, no loss of job, job status, pay, or benefits." 53 Kan. App. 2d at 191. The panel stated,

> "[A]n agency transfer, by definition, does not involve a harm. Instead, a transfer is a lateral move from one position to another with similar or identical duties and similar or identical pay. More importantly, in the KHP, a trooper transfer does not involve any change in employment other than the county of work location.

> "Having established that retaliatory discharge and demotion torts must involve harm, we are very doubtful that our Supreme Court would recognize a tort for retaliatory job placement. Although our Supreme Court's position on this issue would be an interesting question, we do not have to answer that question here. For our research has revealed that all recognized retaliatory torts involved some showing of harm, for instance, that a plaintiff has suffered a loss of job status, a loss of pay, or a loss of benefits.

10

> Without a showing of this kind of harm, Hill's argument for extending the common-law tort for retaliation in violation of public policy is a departure from the parameters established by our Supreme Court in other cases where the court has recognized this kind of a tort." 53 Kan. App. 2d at 192.

That logic carried through to the panel's sovereign immunity conclusion. The panel decided that because a lateral change in job placement could not be a basis for a valid common-law tort claim against *any* employer—public or private—the defendants were entitled to sovereign immunity. 53 Kan. App. 2d at 196 ("Because a private person could not be liable for a retaliatory job placement, then the State has not waived its immunity under K.S.A. 2015 Supp. 75-6103[a]."). The panel then determined its holdings made it unnecessary to consider the State's arguments about two other tort claim act provisions:  K.S.A. 2018 Supp. 75-6104(c) (no liability for enforcement or failure to enforce a law), and K.S.A. 2018 Supp. 75-6104(e) (no liability for discretionary function). 53 Kan. App. 2d at 196.

Hill petitioned this court for review. The defendants did not cross-petition for review as to the panel's three adverse holdings against them:  (1) the KJRA and Civil Service Act did not bar Hill's tort claim; (2) there is a public policy against retaliation for exercising the Civil Service Act appeal right; and (3) there is no adequate alternative remedy for the retaliation alleged by Hill.

To resolve the issues raised in Hill's appeal, we first agree with the Court of Appeals and conclude there is subject matter jurisdiction despite defendants' KJRA and Civil Service Act arguments. We then depart from the panel and conclude the district court correctly denied the defendants' motions to dismiss because the common-law retaliation tort may encompass a retaliatory job transfer by an employer. We also disagree

11

with the panel and hold the defendants are not entitled to KTCA immunity. Finally, we hold Hill raised genuine issues of material facts that preclude summary judgment.

SUBJECT MATTER JURISDICTION

Typically when a party does not cross-petition for review on an issue decided adversely to that party by the Court of Appeals, we deem it as settled on review. *Ullery v. Othick*, 304 Kan. 405, 415, 372 P.3d 1135 (2016); see also Supreme Court Rule 8.03(h)(1) (2018 Kan. S. Ct. R. 53). But the defendants' KJRA and Civil Service Act arguments implicate subject matter jurisdiction, which we have an independent duty to examine. *Stechschulte v. Jennings*, 297 Kan. 2, 29, 298 P.3d 1083 (2013). Accordingly, we address this despite the defendants' silence on review.

Subject matter jurisdiction is a question of law subject to de novo review. *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 395, 204 P.3d 562 (2009). Similarly, this court exercises unlimited review over statutory interpretation and remedies exhaustion. *Siruta v. Siruta*, 301 Kan. 757, 761, 348 P.3d 549 (2015) (statutory interpretation); *Ryser v. State*, 295 Kan. 452, 457, 284 P.3d 337 (2012) (remedies exhaustion).

In *Platt v. Kansas State University*, 305 Kan. 122, Syl. ¶ 5, 379 P.3d 362 (2016), the court held the KJRA "does not apply to the civil tort of retaliatory discharge against an administrative agency." The *Platt* court noted the tort claim at issue was not predicated on an "agency action" subject to exclusive KJRA review, relying on *Lindenman v. Umscheid,* 255 Kan. 610, 875 P.2d 964 (1994), and its progeny. *Platt*, 305 Kan. at 132. We view *Lindenman* and *Platt* as establishing a general rule that torts committed by a state agency fall outside the KJRA's purview.

12

We also note the Civil Service Board dismissed Hill's appeal because it lacked statutory jurisdiction to consider a KHP trooper's duty-station transfer under K.S.A. 2018 Supp. 75-2929d(a)(1). In fact, "transfers" are mentioned elsewhere in the Civil Service Act, suggesting those particular job actions are not within the terms "dismissal, demotion, or suspension" that define the employment decisions subject to board review. See, e.g., K.S.A. 75-2944(a) ("Vacancies in positions shall be filled, so far as practicable, by promotions or *transfers* of persons holding positions in the classified service and in accordance with K.S.A. 75-2942, and amendments thereto." [Emphasis added.]); K.S.A. 75-2947(a) ("In a manner consistent with rules and regulations adopted by the secretary of administration, *transfers* in the classified service may be made from a position in one class to a position in another class when the duties and compensation are similar." [Emphasis added.]).

We hold we have subject matter jurisdiction. Hill is suing in tort for common-law job retaliation, and the Civil Service Act does not provide administrative review for wrongful transfers or job assignments. Hill was not required to exhaust KJRA remedies. See *Platt*, 305 Kan. 122, Syl. ¶ 5.

## THE MOTIONS TO DISMISS

We now turn to the panel's conclusion that the district court erred by denying the defendants' motions to dismiss based on the scope of the common-law tort and KTCA sovereign immunity.

*Standard of review*

We review the ruling on a motion to dismiss de novo. *Lozano v. Alvarez*, 306 Kan. 421, 423, 394 P.3d 862 (2017); *Wachter Management Co. v. Dexter & Chaney, Inc.*, 282 Kan. 365, 368, 144 P.3d 747 (2006). In doing so, we "'must accept the facts alleged by

13

the plaintiff as true, along with any inferences that can reasonably be drawn therefrom'" to determine whether "those facts and inferences state a claim based on plaintiff's theory or any other possible theory." *Platt*, 305 Kan. at 126 (quoting *Cohen v. Battaglia*, 296 Kan. 542, 546, 293 P.3d 752 [2013]); see also *Campbell v. Husky Hogs*, 292 Kan. 225, 227, 255 P.3d 1 (2011); *Halley v. Barnabe*, 271 Kan. 652, 656, 24 P.3d 140 (2001) (when reviewing a motion to dismiss, a court views the petition in a light most favorable to the plaintiff to determine whether the petition states any valid claim for relief).

*Job placement may constitute an actionable retaliation claim.*

Historically, Kansas adheres to the employment-at-will doctrine, "'which holds that employees and employers may terminate an employment relationship at any time for any reason, unless there is an express or implied contract governing the employment's duration.'" *Lumry v. State*, 305 Kan. 545, 562, 385 P.3d 479 (2016) (quoting *Husky Hogs*, 292 Kan. at 227). But that general at-will principle has exceptions.

Some exceptions are statutory, such as prohibiting terminations based on race, gender, or disability. See K.S.A. 44-1009 (unlawful for employer to terminate or otherwise discriminate against a person because of race, religion, color, sex, disability, national origin, or ancestry or to commit other discriminatory employment practices listed in the statute). Still others are noted in our caselaw founded upon articulated public policy grounds. See *Platt*, 305 Kan. at 136 ("public policy" refers to the "principle which holds no citizen can lawfully do that which injures the public good"). "Kansas courts permit the common-law tort of retaliatory discharge as a limited exception to the at-will employment doctrine when it is necessary to protect a strongly held state public policy from being undermined." *Husky Hogs*, 292 Kan. at 229; see also *Lumry*, 305 Kan. at 564; *Platt*, 305 Kan. at 133; *Hysten v. Burlington Northern Santa Fe Ry. Co.*, 277 Kan. 551, Syl. ¶ 1, 108 P.3d 437 (2004). The court has further permitted common-law torts for job

14

actions short of dismissal but equally damaging to the public policy at stake. See *Brigham v. Dillon Companies, Inc.*, 262 Kan. 12, 20, 935 P.2d 1054 (1997) (recognizing "a cause of action for retaliatory demotion" because it is "a necessary and logical extension of the cause of action for retaliatory discharge").

This court previously recognized a public policy against retaliation for: (1) filing a Kansas Workers Compensation Act claim, (2) filing a Federal Employers Liability Act claim, (3) whistleblowing, (4) exercising a public employee's First Amendment free speech rights regarding a matter of public concern, (5) filing a Kansas Wage Payment Act claim, and (6) invoking rights under the Fair Labor Standards Act or Kansas Minimum Wage and Maximum Hours Law. *Pfeifer v. Federal Express Corporation*, 297 Kan. 547, 554-56, 304 P.3d 1226 (2013) (listing 1-5); *Husky Hogs*, 292 Kan. at 225, 228, 237 (listing 1-4 and, for the first time, recognizing 5); *Lumry*, 305 Kan. at 547 (recognizing 6). And we have described three scenarios when determining if a public policy exception to at-will employment exists:

> "(1) The legislature has clearly declared the state's public policy; (2) the legislature enacted statutory provisions from which public policy may reasonably be implied, even though it is not directly declared; and (3) the legislature has neither made a clear statement of public policy nor can it be reasonably implied." *Husky Hogs*, 292 Kan. at 230.

This court has explained that recognition of such claims

> "has rested on a principle of deterrence against employer reprisal for an employee's exercise of a legal right. And in those instances in which an employee is exercising a statutory right created by the legislature, we have noted that such deterrence serves not only the employee's interests but also those of the state and its people. This is because

15

statutory rights exist only because of the legislature's determination that such a right is in the public interest." *Pfeifer*, 297 Kan. at 556.

The panel held there is an anti-retaliation public policy declared in K.S.A. 2018 Supp. 75-2949(g), which states: "No employee shall be disciplined or discriminated against *in any way* because of the employee's proper use of the appeal procedure." (Emphasis added.) See *Hill*, 53 Kan. App. 2d at 187. The defendants do not dispute that K.S.A. 2018 Supp. 75-2949(g) declares a legislatively stated public policy, and they have not cross-petitioned for review of that holding. Nor have they cross-petitioned for review of the panel's further holding that there is no adequate alternative remedy for the retaliation Hill alleged. See *Husky Hogs*, 292 Kan. at 236 (under the alternative remedies doctrine, an adequate alternative statutory remedy may be substituted for a state retaliation claim, precluding the common-law remedy). So to that extent these issues are settled for purposes of our review. See Supreme Court Rule 8.03(h)(1) (2018 Kan. S. Ct. R. 56) ("[T]he issues before the Supreme Court include all issues properly before the Court of Appeals which the petition for review or cross-petition allege were decided erroneously by the Court of Appeals."); *Ullery*, 304 Kan. at 415.

The real issue is what retaliatory employment actions subject a civil service employer to tort liability. Hill alleges his transfer was a "retaliatory adverse employment action" violating the public policy set forth in the statute. He analogizes this to *Brigham*, which recognized the tort for retaliatory demotion, and asks that *Brigham*'s reasoning be extended to adverse job actions short of demotion.

The defendants counter that the policy is enforceable only as directed by the Legislature through the misdemeanor penalty provision in K.S.A. 75-2957 (providing willful violation of Civil Service Act constitutes misdemeanor punishable by fine and imprisonment). They distinguish *Brigham* because a job "assignment," as they

16

characterize what happened to Hill, is not a harmful employment action. The defendants express fear that expanding *Brigham* beyond demotions opens the litigation floodgates over minor personnel decisions. We disagree with the defendants and the narrow formulation of the harm required to constitute tortious conduct that the panel adopted.

Kansas first recognized common-law tort actions by employees for their employers' public policy violations as actions to redress "wrongful discharges in violation of state public policy clearly declared by the legislature or by the courts." *Coleman v. Safeway Stores, Inc.*, 242 Kan. 804, 815, 752 P.2d 645 (1988), *disproved of on other grounds by Gonzalez-Centeno v. North Central Kansas Regional Juvenile Detention Facility*, 278 Kan. 427, Syl. ¶ 4, 101 P.3d 1170 (2004); see also *Palmer v. Brown*, 242 Kan. 893, 900, 752 P.2d 685 (1988) ("[T]ermination of an employee in retaliation for the good faith reporting of a serious infraction of such rules, regulations, or the law by a co-worker or an employer . . . is an actionable tort."). Subsequently, the court in *Brigham* expanded the tort's scope to redress public policy violations short of wrongful termination, when it permitted an employee to pursue a tort claim for retaliatory demotion. *Brigham*, 262 Kan. at 20. The rationale for that leads to our conclusion today that a job transfer like the one Hill experienced may constitute an actionable tort.

In *Brigham*, the plaintiff sued his former employer for wrongfully demoting him to a new job with less pay in retaliation for filing a workers compensation claim. On appeal, the court considered whether retaliatory demotion could be recognized as a cause of action. The court held it should, reasoning such conduct carried a similar coercive effect to retaliatory discharge. As the court explained,

> "The employers' violation of public policy *and the resulting coercive effect on the employee* is the same in both situations. The loss or damage to the demoted employee differs in degree only. We do not share the employers' concern that a torrent of litigation

17

of insubstantial employment matters would follow in the wake of our recognition of a cause of action for retaliatory demotion and, even if we did, it does not constitute a valid reason for denying recognition of an otherwise justified cause of action.

"We conclude that the recognition of a cause of action for retaliatory demotion is a necessary and logical extension of the cause of action for retaliatory discharge. *To conclude otherwise would be to repudiate this court's recognition of a cause of action for retaliatory discharge. The obvious message would be for employers to demote rather than discharge employees in retaliation for filing a workers compensation claim or whistleblowing. Thus, employers could negate this court's decisions recognizing wrongful or retaliatory discharge by taking actions falling short of actual discharge*." (Emphases added.) 262 Kan. at 20.

By contrast, in the Illinois Supreme Court's plurality decision in *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29, 39, 645 N.E.2d 877 (1994), rejecting the expansion of the common-law retaliation tort to include any action short of retaliatory discharge, the court reasoned,

"We decline plaintiff's request to extrapolate from the rationale of [caselaw recognizing a common-law retaliatory discharge tort] a cause of action predicated on retaliatory demotion. [The caselaw] created an exception to the employment-at-will doctrine. In our view, adoption of plaintiff's argument would replace the well-developed element of discharge with a new, ill-defined, and potentially all-encompassing concept of retaliatory conduct or discrimination. The courts then would be called upon to become increasingly involved in the resolution of workplace disputes which center on employer conduct that heretofore has not been actionable at common law or by statute. Although the term 'demotion' may appear amenable to clear definition, many questions arise: Is a demotion in title or status, but not salary, actionable? Could a transfer from one department to another be considered a demotion? Would it be fair to characterize as a demotion a significant increase in an employee's duties without an increase in salary? It is plaintiff's burden, in urging this court to create new rights of action or expand existing ones, to persuade the court of the need for such new or expanded rights."

18

In view of these uncertainties, the *Zimmerman* court declined to "open broad new avenues of litigation for other, less defined types of retaliatory conduct" than discharge "as an exception to the at-will employment doctrine." 164 Ill. 2d at 45-46. But as discussed, our court in *Brigham* adopted a different approach, extending the tort to include both the discharge and the arguably less harmful demotion that mimicked discharge's coercive effect.

Admittedly, the Kansas caselaw to date deals with terminations and demotions, but this is because those happened to be the facts presented—not because they represented some minimum threshold of harm necessary to invoke a cause of action. The *Husky Hogs* court, in particular, noted our history of retaliation cases was about ensuring public policy not be undermined. *Husky Hogs*, 292 Kan. at 229 ("The case law makes it obvious that Kansas courts permit the common-law tort of retaliatory discharge as a limited exception to the at-will employment doctrine when it is necessary to protect a strongly held state public policy from being undermined."). And because under *Brigham* the requisite harm is coercive effect, we are confronted in this case with how to determine whether an employment action is sufficiently coercive to undermine the public policy goal and give rise to tort liability.

For that answer, we turn to the United States Supreme Court's decision in *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). There, the plaintiff claimed her job duties were reassigned in retaliation for her gender discrimination complaint. Considering how harmful an adverse employment action must be to be actionable for Title VII's anti-retaliation provision, the Court held:

"[T]he provision covers those (and only those) employer actions that would have been *materially adverse* to a reasonable employee or job applicant. In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." (Emphasis added.) 548 U.S. at 57.

The Court judged harm using an objective standard based on a reasonable employee and the coercive effect the employer's action would have on such a person. The Court explained,

"[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. 'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.' A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. *But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an 'act that would be immaterial in some situations is material in others.* [Citations omitted.]'" (Emphasis added.) 548 U.S. at 69.

Accordingly, the panel erred by holding Hill could not premise a claim for relief on an employment action short of firing him, reducing his wages or benefits, or diminishing his workplace status. We hold a common-law retaliation claim may be premised on any employment action that is materially adverse to a reasonable employee, i.e., "harmful to the point that [it] could well dissuade a reasonable worker from" exercising the worker's rights under the Civil Service Act. *White*, 548 U.S. at 57.

20

*The KTCA does not immunize defendants.*

As previously noted, our holding on the retaliation tort's scope also resolves the immunity issue against the defendants. "Liability is the rule, and immunity is the exception for governmental entities sued under the KTCA." *Keiswetter v. State*, 304 Kan. 362, 366, 373 P.3d 803 (2016); see also *Thomas v. Board of Shawnee County Comm'rs*, 293 Kan. 208, 233, 262 P.3d 336 (2011). Under the Kansas Tort Claims Act,

> "Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state." K.S.A. 2018 Supp. 75-6103(a).

Stated differently, "[a] governmental entity can be found liable for the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment only if (1) a private person could be liable under the same circumstances and (2) no statutory exception to liability applies." *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 585, 214 P.3d 1173 (2009); see also *Prager v. Kansas Dept. of Revenue*, 271 Kan. 1, 34, 20 P.3d 39 (2001) ("The KTCA creates no new cause of action beyond what is already available under Kansas law, and there can be no greater liability under the KTCA than a private person would have under Kansas law.").

The panel held there could be no governmental liability because Hill's claim fails the first prong, i.e., "a private person could not be liable for a retaliatory job placement" because reassignment is not actionable against any employer. *Hill*, 53 Kan. App. 2d at 196; see *Prager*, 271 Kan. at 34 (sovereign immunity not waived for alleged constitutional tort of depriving free speech because private persons cannot be liable for

21

constitutional torts). But as we have held, a private person can be liable in tort for a retaliatory job placement in violation of a recognized state public policy so this rationale fails. See *Thomas*, 293 Kan. at 233 (because private person could be liable for negligence, court was required to examine whether exceptions to governmental liability applied).

The dissent adopts a different ground than the panel for arguing Hill's claim fails the first prong. The dissent argues: "There is no public policy applicable to private employers embedded in K.S.A. 2018 Supp. 75-2949(g) [of the Civil Service Act]. Therefore, a private employer cannot be subject to this tort." Slip op. at 42. But this avoids the relevant inquiry, i.e., assuming a private employer did retaliate against an employee for appealing, would it be liable for doing so? See K.S.A. 2018 Supp. 75-6103(a) (providing governmental entity liable "under circumstances where the governmental entity, if a private person, would be liable under the laws of this state"). And the answer to that inquiry is certainly yes because we have previously recognized private-employer liability for retaliatory actions similarly injurious to public policy. See *Pfeifer*, 297 Kan. at 555-56; *Husky Hogs*, 292 Kan. at 225, 228; *Lumry*, 305 Kan. at 547.

The dissent's notion that the KTCA preserves governmental immunity in this case simply because the specific facts alleged could not arise in private employment has been rejected. Similar to the KTCA, the Federal Tort Claims Act supplies federal courts with jurisdiction over suits against the United States that arise from wrongful conduct "under circumstances where the United States, if a private person, would be liable . . . in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1) (2012); see 28 U.S.C. § 2674 (2012) ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."). In *Indian Towing Co. v. United*

22

*States*, 350 U.S. 61, 76 S. Ct. 122, 100 L. Ed. 48 (1955), the United States argued it could not be liable for negligently operating a lighthouse under the FTCA because private persons do not operate lighthouses. The Court disagreed, reasoning,

"[I]f the United States were to permit the operation of private lighthouses—not at all inconceivable—the Government's basis of differentiation would be gone and the negligence charged in this case would be actionable. Yet there would be no change in the character of the Government's activity in the places where it operated a lighthouse, and we would be attributing bizarre motives to Congress were we to hold that it was predicating liability on such a completely fortuitous circumstance—the presence or absence of identical private activity." 350 U.S. at 66-67.

The dissent's limited view of the sovereign immunity waiver would also render unnecessary many exceptions to liability expressly carved out by the Legislature in K.S.A. 2018 Supp. 75-6104. And we generally presume our Legislature does not intend to enact useless or meaningless legislation. *Cochran v. State Dept. of Ag., Div. of Water Resources*, 291 Kan. 898, 903, 249 P.3d 434 (2011); see K.S.A. 2018 Supp. 75-6104(a)-(c), (f) (providing exceptions to liability for damages arising from legislative, judicial, and executive functions of government such as enforcement or failure to enforce laws, and from tax assessment or collection); K.S.A. 2018 Supp. 75-6104(n) (providing exception to liability for damages arising from failure to provide, or method of providing, police or fire protection); K.S.A. 2018 Supp. 75-6104(s) (excluding liability for damage claims arising from state-run vending machines along interstate highways).

For example, K.S.A. 2018 Supp. 75-6104(h) excludes governmental liability for "the malfunction, destruction or unauthorized removal of any traffic or road sign, signal or warning device unless it is not corrected by the governmental entity responsible within a reasonable time after actual or constructive notice of such malfunction, destruction or removal" and provides that nothing in the subsection creates "liability arising from the act

or omission of any governmental entity in placing or removing any of the above signs, signals or warning devices *when such placement or removal is the result of a discretionary act of the governmental entity*." (Emphasis added.) Yet no private person could ever be liable for failing to correct a missing, destroyed, or malfunctioning sign, signal, or warning device, upon a public roadway, or for failing to place or remove a nondiscretionary one, because these acts lie exclusively within the government's domain. See K.S.A. 8-1512(a) ("No person shall place . . . upon or in view of any highway any unauthorized sign . . . which purports to be or is an imitation of or resembles an official traffic-control device . . . ."); see also K.S.A. 8-1442 (defining "[o]fficial traffic-control devices" as "all signs signals, markings, and devices . . . placed or erected by authority of a public body or official having jurisdiction for the purpose of regulating, warning, or guiding traffic").

Hill alleged defendants took a materially adverse employment action against him contrary to public policy. Under these circumstances defendants, if private persons, would be liable under the laws of this state. See K.S.A. 2018 Supp. 75-6103(a); *Brigham*, 262 Kan. at 19 ("The linchpin of the tort for retaliatory demotion is a violation of public policy."). Put another way, generally applicable negligence law can make a governmental entity liable for carelessly performing an act that is exclusively governmental in character and which no private person could perform. See *Patterson*, 307 Kan. at 633 ("When a negligence claim is predicated on failure to place a traffic-control device 'the discretionary element in that decision is crucial' to determining whether the governmental entity can be liable."); see also *Indian Towing*, 350 U.S. at 66-67. Likewise, the generally applicable law of employment-related torts might make a governmental entity liable for breaching a legal duty directing its conduct within its own employment relationships, even if the act that constitutes the breach could only occur in the context of government employment.

24

The panel recognized this and applied the appropriate inquiry. But in doing so, it incorrectly resolved the immunity question on the broader basis that Hill did not allege an actionable tort of job retaliation, i.e., Hill based his claim on job placement rather than firing or demotion. *Hill*, 53 Kan. App. 2d at 196 ("Hill has not cited any authority where a private person was liable for *a common-law tort of retaliatory job placement*." [Emphasis added.]). And because its analysis ended at that early point, it did not address the defendants' arguments on the second prong that they are immune under the discretionary function and law enforcement exceptions to the State's sovereign immunity waiver. But those arguments are unavailing as well. The defendants are not entitled to immunity under the exceptions they raised in the Court of Appeals.

To begin with, the defendants waived or abandoned any claim to KTCA immunity under exceptions for damages resulting from "enforcement of or failure to enforce a law" and "failure to provide, or the method of providing, police or fire protection." See K.S.A. 2018 Supp. 75-6104(c), (n). They only briefly raised these exceptions and cited no relevant caselaw to support their arguments. A defendant abandons an argument for application of a particular exception to liability under the KTCA by failing to adequately argue the point. See *Thomas*, 293 Kan. at 233 (holding defendants abandoned argument for application of personnel policy exception under the KTCA that was raised but not supported by pertinent authority; noting government bears the burden to establish KTCA exception); see also *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, 15, 61 P.3d 68 (2002) ("'A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point.'").

This leaves the KTCA's discretionary function exception as the remaining claimed route to governmental immunity. But the defendants' argument fails here as well. Under the KTCA,

25

"A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:

. . . .

"(e) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved." K.S.A. 2018 Supp. 75-6104.

The term "discretionary function or duty" is not defined in the KTCA, so this court looks "foremost to the nature and quality of the discretion exercised" to determine whether a function or duty is discretionary. *Soto v. City of Bonner Springs*, 291 Kan. 73, 79, 238 P.3d 278 (2010). The mere application of judgment is not enough. 291 Kan. at 79.

Generally, the discretionary function exception is inapplicable when there is a "'clearly defined mandatory duty or guideline,'" which can arise from statutes, caselaw, or agency directives. 291 Kan. at 80 (quoting *Nero v. Kansas State University,* 253 Kan. 567, 585, 861 P.2d 768 [1993]). Compare *Cansler v. State*, 234 Kan. 554, 570, 675 P.2d 57 (1984) (the State's duties to confine prisoners and warn the public when they escape were imposed by law and therefore nondiscretionary), with *Patterson*, 307 Kan. at 638 (discretionary function immunity for road sign decisions barred suit against county when applicable guidelines did not mandate placement of allegedly missing road sign under facts alleged by defendant). But this court has cautioned that "'we have not held that the existence of any duty deprives the State of immunity under the discretionary function exception.'" *Thomas*, 293 Kan. at 236 (quoting *Schmidt v. HTG, Inc.*, 265 Kan. 372, 392, 961 P.2d 677 [1998]).

26

The defendants contend that because there was no mandatory duty or guideline governing how they placed Hill, they had unreviewable discretion to make the assignment as they saw fit, which must fall under discretionary function immunity's protective umbrella. We disagree. Their trooper assignment discretion is limited by a clearly defined mandatory duty: "No employee shall be disciplined or discriminated against *in any way* because of the employee's proper use of the appeal procedure." (Emphasis added.) K.S.A. 2018 Supp. 75-2949(g).

Admittedly, the term "discriminated against" in K.S.A. 2018 Supp. 75-2949(g) is not statutorily defined. But that term naturally encompasses an array of acts or omissions in the employer-employee context. For example, in *Londerholm v. Unified School District No. 500*, 199 Kan. 312, 331, 430 P.2d 188 (1967), the court looked to Webster's Third New International Dictionary to define "discriminate" as "'to . . . distinguish between . . . to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit,'" citing *Wimberly v. Ga. So. & Fla. Ry. Co.*, 5 Ga. App. 263, 266, 63 S.E. 29 (1908), to add to its meaning, "'treating one differently from another.'" See Black's Law Dictionary 566 (10th ed. 2014) (defining discrimination as "[d]ifferential treatment; esp., a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored"). *Londerholm* rejected the Attorney General's claim that school teachers could be involuntarily transferred within a school district based on a teacher's race to promote racial integration. *Londerholm*, 199 Kan. at 331.

The statutory language easily leads to the conclusion that an employer subject to K.S.A. 2018 Supp. 75-2949(g) may not discriminate against an employee because the employee exercised the appeal right under the Civil Service Act. So relocating an employee when motivated by a desire to retaliate against that employee for invoking the

27

statutorily protected right is a difference in treatment encompassed within the meaning of "discriminated against" as used in K.S.A. 2018 Supp. 75-2949(g).

The Oklahoma Supreme Court held that Oklahoma's discretionary function exception to governmental tort liability did not immunize a government employer in a retaliatory discharge action based on allegedly discharging employees for pursuing workers compensation claims. *Gunn v. Consolidated Rural Water & Sewer Dist. No. 1, Jefferson County*, 839 P.2d 1345 (Okla. 1992). It reasoned,

> "Implicit in a claim for retaliatory discharge is conduct in breach of that which is legally allowable. It charges the commission of an act that is the very antithesis of permissible conduct—one that by its very nature negates any notion of discretion or any choice among different courses of action. Discharging an employee contrary to the applicable statute is not an exercise of discretionary function within the meaning of [the Oklahoma Tort Claims Act]. It is a breach cognizable by law. When a statute restricts permissible conduct in managing personnel, discretion, which implies freedom of action, is *ipso facto* withdrawn." 839 P.2d at 1350.

The involuntary transfer in Hill's case, if motivated by retaliatory intent as alleged, would constitute prohibited discrimination within the meaning of K.S.A. 2018 Supp. 75-2949(g). Accordingly, despite the defendants' general discretion over personnel decisions such as trooper transfers, the conduct alleged falls outside that discretion's boundary. In other words, the defendants had a duty not to act illegally in the manner Hill alleges. The discretionary function exception does not immunize them from liability for this claim.

MOTION FOR SUMMARY JUDGMENT

Having concluded that an employment retaliation claim may be premised on coercive employer conduct in addition to dismissal and demotion, such as a job

28

reassignment under the circumstances already discussed, we now address whether Hill's summary judgment evidence raised genuine issues of material facts regarding the adverse job action, causation, and pretext elements both lower courts found lacking.

*Standard of review*

We review a district court's grant of summary judgment de novo and read the record under the same rules applicable to the district court. *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 890, 259 P.3d 676 (2011); *Dominguez v. Davidson*, 266 Kan. 926, 929, 974 P.2d 112 (1999).

> """Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.""" *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 24, 378 P.3d 1090 (2016).

To the extent "material facts are uncontroverted, an appellate court reviews summary judgment de novo." *Superior Boiler Works, Inc.*, 292 Kan. at 890 (citing *Central Natural Resources v. Davis Operating Co.*, 288 Kan. 234, 240, 201 P.3d 680 [2009]; *Troutman v. Curtis*, 286 Kan. 452, Syl. ¶ 1, 185 P.3d 930 [2008]).

29

*Genuine issues of material facts preclude summary judgment.*

Kansas adopts a burden-shifting framework for common-law retaliation cases. *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1276, 38 P.3d 679 (2002). Under that framework, to survive summary judgment, an employee must first make out a prima facie case. Then, the burden shifts to an employer to produce a legitimate, nondiscriminatory reason for the challenged employment action. If the employer succeeds, the employee "must assert specific facts establishing a triable issue as to whether the employer's reason . . . is a mere cover-up or pretext" for retaliation. 272 Kan. at 1276.

The lower courts held Hill's claim could not surmount the burden-shifting framework, because in their view Hill failed to make out a prima facie case and failed to show defendants' proffered nondiscriminatory reason for the challenged employment action was a pretext. On each basis, we disagree.

*1. Hill made out a prima facie case.*

To advance a prima facie case of tortious retaliation for pursuing the Civil Service Act appeal right, the employee must show (1) he or she, as a classified employee in the civil service, appealed to the board from a dismissal, demotion, or suspension; (2) the employer knew of the appeal; (3) the employer subjected the employee to a materially adverse job action, i.e., an employment action harmful to the point it could dissuade a reasonable worker from exercising the appeal rights under the Civil Service Act; and (4) a causal connection existed between the protected activity and the subsequent employment action. See *Rebarchek v. Farmers Co-op Elevator*, 272 Kan. 546, 554, 35 P.3d 892 (2001); see also *Husky Hogs*, 292 Kan. at 235; cf. *White*, 548 U.S. at 68-69 (setting out objective standard for harm necessary to render retaliatory employer conduct actionable).

30

There is no dispute Hill appealed his initial dismissal to the Civil Service Board and that the defendants knew about this. But the lower courts concluded Hill failed to make out the remaining, third and fourth elements.

*A. A genuine issue of a material fact exists as to whether transfer was harmful to the point it could dissuade a reasonable worker from exercising the appeal rights under the Civil Service Act.*

The third element of Hill's prima facie case is that defendants subjected him to a materially adverse employment action, i.e., one "harmful to the point that [it] could well dissuade a reasonable worker from" exercising the worker's rights under the Civil Service Act. *White*, 548 U.S. at 57. For guidance on what facts are considered to find this standard is met by an employment action short of termination or demotion, we turn to federal caselaw applying the *White* test. Under *White*, "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances."'" 548 U.S. at 71.

It is undisputed Hill's transfer did not diminish his compensation or job duties. But actions short of diminished responsibilities have been viewed as sufficient to avoid summary judgment, although "'a mere inconvenience or an alteration of job responsibilities[ ]' will not suffice." *Annett v. University of Kansas*, 371 F.3d 1233, 1239 (10th Cir. 2004); see *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) ("While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'").

31

For example, a retaliation claim pursued by a police officer who was laterally reassigned from the detective bureau to road patrol shortly after lodging a discrimination complaint survived summary judgment when the officer deemed this to be an adverse job action and argued the new assignment was "less desirable." *Hampton v. Borough of Tinton Falls Police Department*, 98 F.3d 107, 116 (3d Cir. 1996). A corrections unit manager was transferred to a unit "'nobody wanted to go to'" from one that was considered "especially desirable," and this presented a triable fact issue. *McKinnon v. Gonzales*, 642 F. Supp. 2d 410, 434 (D.N.J. 2009). And one federal district court concluded that "[a] reasonable employee might well be dissuaded from complaining about or reporting prohibited harassment if she believed that she risked being transferred away from the school in which she had worked—and the co-workers and staff with whom she had worked—for more than four years." *Williams v. City of New York*, No. 99 CV 2697, 2006 WL 2668211, at *21 (E.D.N.Y. 2006).

In Hill's case, he adduced enough evidence to create a jury question whether his transfer would dissuade a reasonable person in his position from asserting the Civil Service Act appeal right, even though his pay and job duties were essentially the same in Troops E and H. Hill's summary judgment evidence supports reasonable inferences that the transfer was more than just a "minor" step by the KHP or a "trivial employment action" that only an "irritable, chip-on-the-shoulder employee" would bristle at. Cf. *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) (giving employee the "silent treatment" and moving employee's desk 45 degrees not actionable retaliation); *Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir. 1998) (holding teacher's reassignment to district school within same district, causing commute to increase from 5-7 minutes to 30-40 minutes, was not adverse employment action); see also *Spring v. Sheboygan Area School Dist.*, 865 F.2d 883 (7th Cir. 1989) (holding school principal's transfer to dual principalship of different schools within district along with

32

new employment contract and merit pay increase not a materially adverse change in terms and conditions of employment). More than merely increasing Hill's daily commute, the relocation required him to uproot and move approximately 400 miles from his home. And the evidence demonstrates the KHP avoids such involuntary transfers because of their tendency to disrupt troopers' personal lives. Moreover, the facts viewed in the light most favorable to Hill demonstrate Troop E is an objectively undesirable assignment to be transferred into as compared with other duty stations. Troop E is remote and the KHP has had difficulty retaining troopers there.

The evidence also shows more than Hill's personal preference against being placed in Troop E. Garcia admitted it is a greater challenge to keep troopers in the western part of the state "than perhaps anywhere else in the state." He explained this is because many troopers come from other parts of the state; some troopers have spouses who would have to leave jobs to go there; and the way of life is different than in metropolitan areas and that "some people just would prefer not to be out there." And KHP Major John Eichkorn, who participated in the decision to station Hill in Troop E upon his reinstatement, said, "Notoriously, through the years, we've had a historic shortage of people in Western Kansas, mainly because we see a lot of people want to move from Western Kansas back to eastern Kansas."

These facts present a triable question.

*B. A genuine issue of a material fact exists as to whether the Civil Service Act appeal caused the transfer.*

The fourth element of the prima facie retaliation case, i.e., causation, requires a demonstration "that a causal connection existed between the protected activity or injury" and the adverse employment action. *Rebarchek*, 272 Kan. at 554-55. The panel

33

acknowledged the short time between Hill's reinstatement and the transfer favored Hill's causation case, but it reasoned temporal proximity was a weak "post hoc" argument that was ultimately insufficient to raise an inference of causation. *Hill*, 53 Kan. App. 2d at 204. We disagree with this categorical conclusion that temporal proximity can never alone raise a causation inference. The fact the alleged retaliatory conduct occurred at the defendants' first opportunity to act against Hill, taken in context with the other circumstances, is sufficient to satisfy the causation element of Hill's prima facie case. "A claimant's 'prima facie case is not an onerous burden under the . . . burden-shifting scheme.'" *Rebarchek*, 272 Kan. at 557.

Temporal proximity is the beginning point although it is not the sole means of proving causal connection. When the proximity between the protected action and the alleged retaliation is "'very close,'" timing alone can be sufficient to make out a prima facie causation case; otherwise, the plaintiff must come forward with additional evidence to establish causal connection. 272 Kan. at 555; 8 Larson on Employment Discrimination § 129.05 (2018). Evidence that the retaliation occurred the day the defendant learned about the employee's protected action has been held sufficient to supply evidence of causal connection. *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Even a gap of four to six weeks has been held close enough to raise the inference. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171-72 (10th Cir. 2006).

In *Ford v. General Motors Corp.*, 305 F.3d 545, 554-55 (6th Cir. 2002), a five-month delay did not destroy the causal connection inference generally raised by the very close temporal connection between filing a race discrimination claim against a supervisor and that supervisor's alleged retaliation. The employee voluntarily transferred from the supervisor's department about a month after filing his complaint. When he was placed back under the supervisor's direction five months after filing the claim, the supervisor

34

imposed increased work on him, subjected his performance to heightened scrutiny, and threatened to fire him. The court reasoned,

> "Although 'temporal proximity alone will not support an inference in the face of compelling evidence' to the contrary, 'the proximity in time between protected activity and adverse employment action may give rise to an inference of a causal connection.' *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir.1987) (citations omitted).

> "Plaintiff's measure of time is more appropriate in this situation, as the adverse action began almost immediately after Reiser resumed his supervision of Ford in Department 71. Previously, Ford was under Bricino's supervision as a porter. Reiser was aware that Ford had long complained of a racially hostile workplace and knew that Plaintiff had filed a complaint with the EEOC. A trier of fact could impute a retaliatory motive to Reiser, in as much as he supervised Ford at the time of the EEOC filing and did nothing to defuse the racial tension in Department 71 that led to Ford's suspension. Once under Reiser's supervision again, Ford claims that his workload increased, that he was subjected to heightened scrutiny, and that he was threatened with termination if his struggles at the drive-off continued. Such facts are enough to show a causal connection, for purposes of a *prima facie* case." *Ford*, 305 F.3d at 554-55.

The same logic leads to the conclusion that Hill established a prima facie case for causation. In implementing the Civil Service Board's reinstatement order, Garcia "transferred" Hill to Troop E. And since Garcia and the KHP were effecting the Civil Service Board order, they plainly knew Hill appealed the initial personnel decision. The alleged retaliatory act occurred at the defendants' first chance to retaliate, and this was inextricably linked to the unprecedented reinstatement. Under these circumstances, a jury could impute retaliatory motive based on the nearly instantaneous temporal connection between the reinstatement order and the transfer.

35

*2. A genuine issue of a material fact exists as to whether the nondiscriminatory reason for transfer was pretext.*

In addition to establishing a prima facie case, to survive the burden-shifting framework when an employer proffers a legitimate, nondiscriminatory reason for an adverse job action, an employee must show that reason is pretext. To raise a triable issue of whether the employer's reason is mere pretext, the employee's evidence may include that the employee was treated differently than others similarly situated; the employer's treatment of the employee before the protected action; and the employer's response to the protected action. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

In *Rebarchek*, 272 Kan. 546, an employee successfully raised a genuine issue of whether his poor job performance was a pretext for discharging him in retaliation for filing a workers compensation claim. Defendants claimed the plaintiff failed to maintain the condition of grain stored at the storage facility where the plaintiff was a manager. But there was evidence the defendants already knew how much grain was out-of-condition when they reprimanded him several weeks before the firing, and just days before a surgical procedure related to his compensation claim. There was also evidence other employees with similar performance deficiencies were not terminated.

In Hill's case, the defendants proffered a legitimate, nondiscriminatory reason for Hill's transfer: Troop E's extreme manpower shortage. Hill presented evidence showing that reason is a pretext, including proof that no trooper was subjected to an involuntary duty station transfer for at least four decades. The defendants and the panel make much of the fact that "Hill was the only known trooper to have successfully appealed his dismissal to the [board]," so the KHP was "dealing with an unprecedented situation." *Hill*, 53 Kan. App. 2d at 205. According to the panel, "because the sum of Hill's predicament is unique,

36

Hill must come up with other reasons why his placement in Troop E was retaliatory." 53 Kan. App. 2d at 206. But this misses the point. It is this very uniqueness that raises the inference of pretext—the only reason Hill was treated differently than other troopers was that he was returning from the KHP's attempt to wrongfully terminate his employment as demonstrated by his successful Civil Service Act appeal.

The defendants concede they treated Hill as a new hire—instead of as an experienced trooper—and transferred him to a different region after he secured reinstatement. And it is undisputed experienced troopers do not get involuntarily relocated after their initial assignment. Garcia even self-described this job action as a transfer in his letter to Hill informing him that he was headed to southwestern Kansas to resume his duties.

Viewed in the light most favorable to Hill, this unquestionably establishes how the defendants treated Hill differently in his terms and conditions of employment as compared to his fellow troopers. They denied him the insulation from relocation that other troopers enjoyed. Instead, they treated him as a new hire and forced him to relocate to keep the job he fought them to regain. What's more, they relocated him hundreds of miles away to a region obviously considered undesirable to most other troopers. And he was treated this way, i.e., stripping him of his status as a veteran trooper, *only* because of his successful civil service appeal.

The panel also faulted Hill for not controverting the fact that Troop E was in the greatest need of new troopers when he was assigned there. But so what? This requires too much of Hill. "[A]n employer's reason need not be false in order to be proven pretextual." 1 Larson on Employment Discrimination § 8.04[2] (2018).

While the panel pointed out evidence that could persuade a jury the defendants lacked retaliatory intent—such as Hill's experience perhaps being beneficial to training the two new recruits on patrol in Troop E—neither the trial court nor appellate court "can or should weigh the relative factual positions of the parties in the context of summary judgment." *In re Palmer*, 46 Kan. App. 2d 805, 812, 265 P.3d 565 (2011). A court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue requires it to determine the state of mind of one or both of the parties. See *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 974, 298 P.3d 250 (2013) ("[T]he fact question of the existence of good or bad faith is peculiarly inappropriate for summary judgment."); *Smith v. Farha*, 266 Kan. 991, 997-98, 974 P.2d 563 (1999) (whether defendant acted with malice is a factual question for a jury and, unless undisputed, summary judgment is inappropriate).

Hill's summary judgment evidence raised genuine issues of material facts as to whether the transfer would dissuade a reasonable worker from exercising civil service appeal rights; whether Hill's decision to appeal caused the transfer; and whether the Troop E staffing shortage was merely pretext for retaliation.

The district court erred in granting summary judgment to the defendants.

Reversed and remanded.

\* \* \*

STEGALL, J., dissenting:  The majority acknowledges that under the Kansas Tort Claims Act (KTCA) "a governmental entity can be found liable for the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment only if (1) a private person could be liable under the same circumstances and

38

(2) no statutory exception to liability applies." *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 585, 214 P.3d 1173 (2009); slip op. at 21; see K.S.A. 2018 Supp. 75-6103(a).

Thus, the threshold question of this case is whether a private person could be liable under these circumstances. The majority answers generically that "a private person can be liable in tort for a retaliatory job placement in violation of a recognized state public policy." Slip op. at 22. To this end, the majority paints the public policy proclaimed in K.S.A. 2018 Supp. 75-2949(g) with a broad brush, claiming it is stuck with the Court of Appeals' holding that the statute "embodie[s] a clear 'public policy against employers retaliating against employees who appeal their dismissal, demotion, or suspension.'" Slip op. at 10 (quoting *Hill v. State*, 53 Kan. App. 2d 155, 187, 388 P.3d 122 [2016]). Indeed, the majority considers this holding to be "settled" because the State did not cross-petition for its review. Slip op. at 16.

But the majority has selectively quoted the panel's holding, which was narrower than the majority suggests:  "[B]y enacting K.S.A. 75-2949(g), the legislature clearly declared Kansas' public policy against employers retaliating against employees who appeal their dismissal, demotion, or suspension *under K.S.A. 75-2949*." (Emphasis added.) 53 Kan. App. 2d at 187. That is, the panel recognized that K.S.A. 2018 Supp. 75-2949(g)'s anti-retaliation policy provided protection only to employees facing retaliation for appealing a dismissal, demotion, or suspension to *the Civil Service Board*. See 53 Kan. App. 2d at 186 ("Based on the plain language of K.S.A. 75-2949[g], it is clear that there is a public policy against *State employers* retaliating against employees for using the appeal procedures to challenge dismissals, demotions, and suspensions under K.S.A. 75-2949[d]-[f]") (Emphasis added.); K.S.A. 2018 Supp. 75-2949(f) ("Any permanent [civil service] employee finally dismissed, demoted or suspended, may request a hearing from the state civil service board to determine the reasonableness of such action.").

Thus, even if the panel's public policy holding must stand, it never extended to private employers and does not and cannot trump sovereign immunity, as the panel itself recognized. See 53 Kan. App. 2d at 193-96; see also *Connelly v. State Highway Patrol*, 271 Kan. 944, 962, 26 P.3d 1246 (2001) (affirming sovereign immunity is a jurisdictional question that courts are "'compelled to address'"). Here, the State only waived its sovereign immunity for employment retaliation claims under circumstances where a private person could be liable. See K.S.A. 2018 Supp. 75-6103(a). Yet the public policy embodied in the Civil Service Act at K.S.A. 2018 Supp. 75-2949(g) does not apply to all generic "employers" as the majority suggests. It applies only to *the State* as an employer. K.S.A. 2018 Supp. 75-2949(g) prohibits retaliatory actions "because of the employee's proper use of the appeal procedure," meaning because of the employee's appeal to the Civil Service Board. A private employee cannot appeal to the Civil Service Board because that remedy is exclusive to public employees. See K.S.A. 2018 Supp. 75-2949(f); K.S.A. 2018 Supp. 75-2929d(a) (authorizing the Civil Service Board to hear appeals "concerning demotion, dismissal or suspension of a permanent employee in the classified service"); K.S.A. 2018 Supp. 75-2935 (dividing the civil service of the State of Kansas into classified and unclassified services).

To confront this reality, the majority analogizes to circumstances in which a private actor—subject to general tort principles—could be liable for similar acts, even if the state actor's specific conduct is exclusively governmental. See slip op. at 22-24. Thus, the majority reasons, we must assume in this case that "a private employer did retaliate against an employee for appealing" to the Civil Service Board and then ask whether, according to general tort principles, the private employer would "be liable for doing so?" Slip op. at 22. The majority is willing to overlook the real-world impossibility of this scenario because "generally applicable negligence law can make a governmental entity liable for carelessly performing an act that is exclusively governmental in character and

40

which no private person could perform." Slip op. at 24. So, for example, "the generally applicable law of employment-related torts might make a governmental entity liable for breaching a legal duty directing its conduct within its own employment relationships, even if the act that constitutes the breach could only occur in the context of government employment." Slip op. at 24.

But there *is no* "generally applicable negligence law" for us to turn to here. Indeed, before today, there was no common-law tort of retaliation springing from the "strongly held state public policy" embedded in K.S.A. 2018 Supp. 75-2949(g). Slip op. at 19-20. The majority has recognized the tort here for the first time, based exclusively on that embedded public policy. And herein lies the problem—the public policy as declared by the Legislature and relied on by the majority does not apply to private employers. The majority has, without statutory foundation, simply extended K.S.A. 2018 Supp. 75-2949(g)'s public policy to private employers to recognize and enforce a brand new tort against the State—a tort for which the state has never waived its sovereign immunity.

It may seem counterintuitive to say a public employee cannot sue the State when the State violates a public policy embodied in the Civil Service Act. The majority is understandably uncomfortable with this outcome. But whether the State's choice to waive (or not waive) sovereign immunity in any given circumstance makes good sense shouldn't be our concern. See, e.g., *Virginia Office for Protection and Advocacy v. Stewart*, 563 U.S. 247, 253, 131 S. Ct. 1632, 179 L. Ed. 2d 675 (2011) ("A State may waive its sovereign immunity at its pleasure."). The State has the power to both create and subject itself as an employer to certain policies—such as K.S.A. 2018 Supp. 75-2949(g)'s policy against retaliation for appeals to the Civil Service Board—and to define the remedies for violating those policies. See K.S.A. 75-2957 (imposing misdemeanor penalty for any willful violation of the Act).

41

In sum, the State of Kansas has only waived its immunity from liability for the wrongful acts or omissions of its employees in circumstances where a private employer could likewise be liable. There is no public policy applicable to private employers embedded in K.S.A. 2018 Supp. 75-2949(g). Therefore, a private employer cannot be subject to this tort. And because the tort itself cannot apply to private employers, the State is immune from Hill's claim.

I respectfully dissent.

LUCKERT, J., joins the foregoing dissenting opinion.